PEOPLE v COOK

Docket No. 77-2646. Submitted November 15, 1978, at Lansing.—
Decided March 19, 1979. Leave to appeal denied, 406 Mich
1002.

C. Eugene Cook, II, was convicted in a bench trial of securities
fraud in connection with the offer and sale of a security, of
securities fraud as an investment advisor, and of obtaining
money under false pretenses, Van Buren Circuit Court, Meyer
Warshawsky, J. The convictions arose from a transaction in
which the defendant, who previously had been a registered
stockbroker in Michigan, obtained and sold some bonds to a
woman for whom he had acted as stockbroker for several years.
The defendant charged a markup on the bonds which the
prosecution considered excessive and had not disclosed the
amount of his markup to the customer prior to billing her for
the bonds. Defendant appeals, questioning the sufficiency of the
trial court's findings of fact and the validity of those findings
and the court's conclusions of law. *Held:*

1. The trial court's findings of fact, although conclusory on
their face, when judged in the context of legal and factual
issues raised by the parties, are not so insufficient as to require
that the case be remanded for a more detailed statement of
facts.

2. The trial court did not clearly err in determining that the
defendant's failure to disclose the market price of the bonds
and his markup was a material omission, that the omission was
misleading under the circumstances, and that the defendant's
conduct operated as a fraud.

3. The defendant's conviction of securities fraud as an invest-

REFERENCES FOR POINTS IN HEADNOTES

[1] 5 Am Jur 2d, Appeal and Error §§ 414, 839.

[2] 5 Am Jur 2d, Appeal and Error § 727.

[3] 69 Am Jur 2d, Securities Regulation—State, §§ 6, 8, 10.

[4] 69 Am Jur 2d, Securities Regulation—Federal, § 478.
    69 Am Jur 2d, Securities Regulation—State, §§ 102, 103.

[5] 69 Am Jur 2d, Securities Regulation—Federal, § 475.

[6] 69 Am Jur 2d, Securities Regulation—Federal, §§ 416, 482.

[7] 69 Am Jur 2d, Securities Regulation—State, §§ 8, 10, 102, 103.

[8] 69 Am Jur 2d, Securities Regulation—State § 94.

[9] 32 Am Jur 2d, False Pretenses § 15.

ment advisor was error because the evidence did not show that he received any compensation primarily for investment advice.

4. The relationship between the defendant and the customer was such that she could not be expected to protect herself from the defendant's misrepresentations and omissions regarding the excessive and arbitrary nature of his markup. Therefore, his conviction of obtaining money under false pretenses was proper.

Affirmed in part, reversed in part, and remanded for resentencing.

1. APPEAL AND ERROR — FINDINGS OF FACT — REMAND — COURT RULES.

The purpose of the court rule which requires a trial court sitting without a jury to find the facts specially is to facilitate appellate review by revealing the law applied by the judge, and a case should not be remanded for further findings of fact unless a remand would serve the purpose of the court rule (GCR 1963, 517.1).

2. APPEAL AND ERROR — FINDINGS OF FACT — SUFFICIENCY OF FINDINGS.

A trial court's findings of fact cannot be judged sufficient or insufficient on their face; they must be judged in the context of specific legal and factual issues raised by the parties and the evidence.

3. SECURITIES REGULATION — UNIFORM SECURITIES ACT — STATUTES — LIBERAL CONSTRUCTION.

The Uniform Securities Act should be construed liberally in order to effectuate the purpose of the act, which is to insure full disclosure and fair dealing in the context of security transactions (MCL 451.501 et seq.; MSA 19.776[101] et seq.).

4. SECURITIES REGULATION — FRAUD — OMISSION OF FACTS — QUESTION OF FACT.

The determination of whether a particular omission of any facts by a securities broker in a securities transaction is material and misleading and whether a particular course of conduct operates as a fraud varies from case to case and is a question of fact to be determined in the first instance at trial.

5. SECURITIES REGULATION — STOCKBROKERS — DUTIES — MATERIAL FACTS — STATUTES.

A material fact, for purposes of the statute regarding the duties imposed upon a securities broker, is one that a reasonable investor might have considered important to his investment decision (MCL 451.501; MSA 19.776[101]).

6. SECURITIES REGULATION — SALE OF SECURITIES — FAILURE TO
REVEAL MARKUP — MISLEADING OMISSION.

A trial court did not clearly err in its finding that a stockbroker's
failure to reveal to an investor the markup on a bond was
misleading where the evidence and testimony indicated that
the markup was excessive and arbitrary, the broker character-
ized the size of his fee to be small and attributed the markup to
paperwork and difficulty in obtaining the bond, the investor
was not a sophisticated buyer, and the broker had gained the
confidence of the buyer who relied on the broker's special
knowledge.

7. SECURITIES REGULATION — SALE OF SECURITIES — OMISSIONS —
FRAUD — WILFULLNESS — STATUTES.

"Wilfullness", as used in the Uniform Securities Act, differs
essentially from negligence; in order to wilfully violate those
provisions dealing with material and misleading omissions and
fraudulent conduct in connection with the offer, sale or pur-
chase of any security, a person must intend the omission or the
course of conduct and must know or recklessly fail to discover
facts that render his conduct violative of those provisions,
however, he need not act with the conscious purpose to mislead
or defraud nor is it necessary that he know his conduct violates
the law (MCL 451.501, 451.809; MSA 19.776[101], 19.776[409]).

8. SECURITIES REGULATION — FRAUD — INVESTMENT ADVISORS —
STATUTES — FINDINGS OF FACT.

A trial court's finding of fact is clearly erroneous where although
there is evidence to support it the reviewing court on the entire
evidence is left with the firm and definite conviction that a
mistake has been committed; a defendant's conviction for secu-
rities fraud as an investment advisor must be reversed where
the evidence does not show that the defendant, who charged an
excessive markup in the sale of a bond, received any of the
markup in exchange for investment services (MCL 451.502[a];
MSA 19.776[102][a]).

FALSE PRETENSES — OPINION — REPRESENTATION OF FACT — CRIMI-
NAL LAW — STATUTES.

A false opinion, as opposed to a false representation of fact, is not
a false pretense within the meaning of the statute prohibiting
the obtaining of money under false pretenses; however, a
dishonest statement of opinion may be a false pretense if the
relationship between the defendant and the victim is such that
the victim cannot be expected to protect himself (MCL 750.218;
MSA 28.415).

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Thomas C. Nelson,* Assistant Attorney General, for the people.

*Reid & Reid, P.C.* (by *Joseph D. Reid* and *Lawrence J. Emery),* for defendant on appeal.

Before: CYNAR, P.J., and R. B. BURNS and M. B. BREIGHNER,* JJ.

M. B. BREIGHNER, J. Defendant was charged with seven violations of the Michigan Uniform Securities Act, MCL 451.501 *et seq.;* MSA 19.776(101) *et seq.* The information also charged one count of obtaining money under false pretenses, MCL 750.218; MSA 28.415. After a bench trial, defendant was convicted of the false pretenses charge and two of the securities charges. The court sentenced him to 23 days incarceration and fined him $4,750. Defendant appeals as of right. We affirm in part and reverse in part.

The three guilty verdicts involved a bond transaction between defendant and Winifred G. LaFever. The bond transaction was one in a series of business transactions between defendant and Mrs. LaFever during a period from May to September, 1974.

Prior to 1974, defendant had been a registered stockbroker in this state. From 1963 to 1969, he acted as a stockbroker for Mrs. LaFever and her husband. After the death of her husband in 1969, Mrs. LaFever continued to contact defendant regarding her investments. She relied on his advice in buying and selling shares of stock.

In 1973, defendant moved to Arizona and incorporated an investment firm dealing in precious

---

* Circuit judge, sitting on the Court of Appeals by assignment.

metals. Before leaving Michigan, he notified Mrs. LaFever he would no longer manage her portfolio.

In late 1973 or early 1974, defendant began to solicit Mrs. LaFever to purchase gold and silver. The first conversation with her was mostly social. In subsequent conversations, defendant suggested the purchase of gold and silver coins to hedge against loss of security value. To finance the purchase of coins he discussed sale of shares of stock held by Mrs. LaFever.

Mrs. LaFever decided to liquidate some of her investments and purchase coins from defendant. Following defendant's instructions, stock certificates, secured from her New York stockbroker, were forwarded to defendant with authority to sell. Proceeds of sale went into Mrs. LaFever's account with defendant and were used to purchase foreign coins at a high markup.

As more coins were purchased from stock sales, Mrs. LaFever told defendant she needed to earn some income from her assets. Defendant offered to explore the acquisition of an appropriate municipal bond. Subsequently, defendant recommended purchase of a $5,000 Puerto Rican Telephone Authority bond. Mrs. LaFever agreed to the purchase.

Defendant purchased five Puerto Rican municipal bonds in his firm's name. The combined face value of the bonds was $5,000. Their cost to defendant was $5,192. Defendant billed Mrs. LaFever $5,750.

Upon receiving the price statement Mrs. LaFever called defendant and asked why it cost her $5,750 for a $5,000 bond. "He assured", she testified, "that there was a lot of paperwork and it was hard to get". She also stated defendant did not tell her what part of the total price was his "fee", but he "probably" characterized the "size of the fee"

as " 'a percent' or 'a small amount' ". Defendant disclaimed representations as to commissions on the bond transaction. He testified the bonds were sold on a dealer-principal basis.

Defendant's percentage markup on bonds sold Mrs. LaFever was 10.7. The state's expert testified a normal markup on such bonds was less than five percent,[1] but industry rules[2] did not require markup disclosure. Defendant's expert said a markup of even 11 percent could not be considered excessive without knowledge of other factors attending the transaction, especially an isolated transaction.

Defendant testified he bought the bonds "short" and the markup reflected his risk. The state's expert testified the price of the subject bonds fluctuated in a narrow range during the month in question. In his argument to the court, the prosecutor pointed out defendant charged the same price for bonds held for 12 or 13 days as for bonds held two days.

Regarding the difficulty in obtaining the bonds, evidence showed they were obtainable from a broker with whom Mrs. LaFever had an account.

One count of the information against defendant charged wilfull failure to disclose material facts and engaging in a course of business which operated as a fraud "in connection with the offer to sell and sale by him of a security". Another count charged him with wilfull fraud as an investment advisor. A third count charged that defendant,

---

[1] The witness was Richard W. Hamilton, Vice President and National Manager of Harris-Upham's Municipal Bond Department during the period July through August, 1974. He testified Harris-Upham's "markup" on such bonds was one-half to two percent and the National Association of Securities Dealers guideline for markups was five percent.

[2] Reference here is to guidelines established by the National Association of Securities Dealers. See also note 1, *supra.*

with intent to defraud, falsely represented he was a licensed securities agent in Michigan; that he would locate an appropriate bond for Mrs. LaFever and sell it to her at the current market price plus a small commission; and that the purchase price of the bond was based on difficulty in acquiring it.

Defendant was found guilty on these three counts. He was acquitted on five others charging fraud and deceit in connection with the coin sales and violations of certain registration requirements.

The trial court's findings are conclusory. With regard to the securities counts, the court stated it found each ultimate fact necessary to sustain a conviction. It did not reveal the basis for each finding.[3] With regard to the false pretenses count,

---

[3] The court stated:

"As to count 3 [the charge under § 101], the Court finds that the People have proven beyond a reasonable doubt that C. Eugene Cook named in said count is one and the same as the defendant in this case; that from on or about the last week of July, 1974, to the first week of August, 1974, in the City of South Haven, County of Van Buren, and State of Michigan, that the defendant did directly and indirectly in connection with the offer to sell and the sale by him of securities, a Puerto Rican Telephone Authority bond, A-8075, to one Winifred G. LaFever; that he did wilfully, knowingly engage in a practice and course of business which would and did operate as a fraud and a deceit upon said Winifred G. LaFever. Further, that the defendant did knowingly and wilfully omit to state certain material facts necessary in order to make the statement made in the light of the circumstances under which they were made not misleading; that the defendant did as a result of said unlawful conduct unlawfully obtain money upon the property from said Winifred G. LaFever in connection with said sale of said bond; that this is contrary to the provisions of M.S.A. 19.776(101) as charged by the People in this court. It is the verdict of the Court that the defendant C. Eugene Cook is guilty beyond a reasonable doubt of the crime as charged in count 3, and this verdict is ordered to be entered upon the record of this Court."

\* \* \*

"As to count 7, the Court finds that the People have proven beyond a reasonable doubt that the C. Eugene Cook named in this count is one and the same as the defendant in this case; that from on or about the last week of July, 1974, to the first week of August, 1974, in the City of South Haven, County of Van Buren, State of Michigan, that the said defendant received consideration from one Winifred G.

the court stated its findings with more specificity by repeating language of the information. The court found defendant had "falsely represented and pretended that he was a securities agent authorized in Michigan * * * [and] that he would locate * * * an appropriate municipal bond for said Winifred G. LaFever to purchase at the then existing current market price plus a small commission".

Defendant's appeal raises an issue as to the sufficiency of the trial court's findings of fact. It also presents questions concerning the validity of the trial court's findings of fact and conclusions of law with respect to each of the defendant's three convictions.

### SUFFICIENCY OF THE FINDINGS OF FACT

Rule 517.1 of the Michigan Court Rules imposes two distinct duties upon a trial court sitting without a jury. The court must make a sufficient statement of its findings of fact and must not make findings of fact that are clearly erroneous. Failure to satisfy the first obligation necessitates remand for further findings. Any finding of fact that is clearly erroneous may be set aside on appeal. As stated above, the present appeal challenges both the sufficiency of the lower court's fact

---

LaFever primarily for advising her as to the purchase of a security, a Puerto Rican Telephone Authority bond, number A-8075, later selling the same to her, he acting as an investment advisor; and the said defendant did unlawfully, knowingly, and wilfully and intentionally engage in transaction practices and a course of business which would and did operate as a fraud and a deceit upon said Winifred G. LaFever, causing her to unlawfully pay monies in connection with said bond transaction as charged by the People in this Court; and that in connection with this count, the conduct of the defendant is contrary to the provisions of M.S.A. 19.776(102) as charged. It is the verdict of the Court that the defendant C. Eugene Cook is guilty beyond a reasonable doubt of the crime as charged in count 7, and this verdict is ordered to be entered upon the record of this Court."

findings and the validity of certain findings made. This part of the opinion discusses the sufficiency issue only.

Defendant claims his case must be remanded because the trial court's conclusory statement of facts fails to disclose key factual determinations which caused the court to convict. We agree the court's findings on their face are conclusory. There is, however, no need to remand for a more detailed statement.

The purpose of requiring a trial court to "find the facts specially" is to facilitate appellate review. *People v Jackson,* 390 Mich 621; 212 NW2d 918 (1973). "Findings of fact in a nonjury case serve a function paralleling the judge's charge in a jury case, that of revealing the law applied by the fact finder." *Id.,* 627. A case will not be remanded for further findings of fact unless a remand would serve the purposes of the court rule. *People v Jackson,* 81 Mich App 18; 264 NW2d 101 (1978).

It follows that findings of fact cannot be judged sufficient or insufficient on their face. But see, 2 Honigman & Hawkins, Michigan Court Rules Annotated, pp 593-595. They must be judged in the context of specific legal and factual issues raised by the parties and the evidence. See *People v Jackson, supra* at 627, fn 3. Compare, *e.g., People v Green,* 32 Mich App 482; 189 NW2d 122 (1971), and *People v George Scott,* 21 Mich App 217; 175 NW2d 312 (1970), with *People v Bedford,* 78 Mich App 696; 260 NW2d 864 (1977), and *People v Stanford,* 68 Mich App 168; 242 NW2d 56 (1976). In that context this Court has even upheld a general verdict of guilty by a court sitting without a jury. *People v Jackson, supra.*

There is no purpose in remanding this case for further findings of fact. Some of the arguments

made by defendant have no evidentiary predicate. In reviewing the other issues raised by defendant which are supported by the evidence, we have not reached a point in our analysis where there is considerable doubt about the law applied by the trial court.

### DEFENDANT'S CONVICTION FOR SECURITIES FRAUD IN CONNECTION WITH THE OFFER AND SALE OF A SECURITY

The Michigan Uniform Securities Act is based upon the Uniform Securities Act. Section 101 of the statute provides in pertinent part:

"It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:

\* \* \*

"(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

"(3) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person." MCL 451.501; MSA 19.776(101).

Section 409 of the act makes criminal any wilfull violation of § 101. See MCL 451.809; MSA 19.776(409).

Defendant claims his conviction under § 101 must be reversed for two reasons. First, he argues there was no duty to disclose the markup on Puerto Rican bonds sold Mrs. LaFever. He further contends that the trial court's conclusory findings do not disclose a finding of specific intent to defraud, which is necessary to a finding of "wilfull-

ness". We find no reversible error on either ground.

*Duty*

Section 101 of the securities act imposes a duty of full disclosure and fair dealing in the context of security transactions. *Cf.,* Mathews & Sullivan, *Criminal Liability for Violations of the Federal Securities Laws: The National Commission's Proposed Federal Criminal Code, S. 1 and S. 1400,* 11 American Criminal L Rev 883, 894-895 (1973), *quoting,* H R Rep, No 85, 73d Cong, First Sess, p 2 (1933) (purpose of analogous Federal securities regulations). The act should be construed liberally to effectuate this purpose. *People v Dempster,* 396 Mich 700; 242 NW2d 381 (1976).

The duties imposed by § 101 are analogous to duties imposed by Rule 10b-5 of the Federal securities regulations. 17 CFR, § 240.10b-5. Some Federal courts have held that the "scope" of the duty imposed by rule 10b-5 depends on the relationship between the victim and the defendant, their relative access to information, the benefit the defendant derives from the transaction, and the activity of the defendant in encouraging the transaction. See *e.g., First Virginia Bankshares v Benson,* 559 F2d 1307, 1314 (CA 5, 1977), *White v Abrams,* 495 F2d 724, 731 (CA 9, 1974). Under this so-called duty analysis approach, the appropriate duty imposed varies as a matter of law from case to case. *White v Abrams, supra* at 734.

As we read § 101 of the Michigan act, the duties imposed arise "in connection with the offer, sale or purchase of any security" and remain constant. Subsection 101(2) imposes a duty to disclose all material facts necessary to make other statements not misleading under the circumstances. Subsec-

tion 101(3) imposes a duty to refrain from any act, practice, or course of business which operates or would operate as a fraud. The determination that a particular omission is material and misleading and that a particular course of conduct operates as a fraud will vary from case to case. These are questions of fact to be determined in the first instance at trial. As stated previously, nonjury findings of fact cannot be set aside on appeal unless they are clearly erroneous. GCR 1963, 517.1.

The legal or "duty" question involved in any prosecution under § 101 is whether the defendant *should* have to refrain from the particular omission found to be material and misleading under subsection 101(2) or to refrain from the course of conduct found to operate as a fraud under 101(3). That question has been resolved by our Legislature.

It is unquestionable that the complained-of conduct of the present defendant arose "in connection with the offer, sale or purchase of any security".

The essential omission alleged was defendant's failure to disclose the market price of the bonds and his markup. The trial court did not clearly err in finding the alleged omission to be "material". A material fact is one that a reasonable investor might have considered important to his investment decision. *Mills v Electric Auto-Lite Co,* 396 US 375, 384; 90 S Ct 616; 24 L Ed 2d 593 (1970). Mrs. LaFever, as a reasonable bond purchaser, might have considered it important that her seller was charging far in excess of what others were charging for the same bond.

Further, the court did not clearly err in finding the alleged omission to be misleading under the circumstances. There is some evidence defendant

characterized the size of his fee to be a small amount. Mrs. LaFever testified defendant told her the $750 difference between face value and purchase price of the bond was based on paper work and difficulty in obtaining the bond. Experts testified the markup was excessive and arbitrary. Mrs. LaFever was not a sophisticated buyer. There is evidence to support a finding defendant had gained her confidence and she relied on his special knowledge. Under analogous Federal securities provisions, the United States Court of Appeals has found failure to reveal the markup on securities to be material and misleading. See *Charles Hughes & Co, Inc v Securities & Exchange Comm,* 139 F2d 434 (CA 2, 1943) (failure to disclose under § 17[a] of Federal securities law).

Finally, on this record the trial court did not clearly err in finding defendant's conduct operated as a fraud. *Cf., id.*

In support of his contention that he owed no duty in this case, defendant cites *Hafner v Forest Laboratories, Inc,* 345 F2d 167 (CA 2, 1975), and *Arber v Essex Wire Corp,* 490 F2d 414 (CA 6, 1974). The Court in *Hafner* held a corporation breached no duty under Rule 10b-5 by failing to give the current market price of its securities upon request by a buyer. The Court reasoned the information was equally available to both parties in daily national quotation sheets and no fiduciary relationship existed between the parties. *Arber* held a buyer (insider) has no duty to direct its seller's (outsider) attention to routine data commonly found in a company's books, at least when the information is readily available and the outsider knows it is available and makes no inquiry.

Both cases are distinguishable from this case. These cases present a situation where the omission

subject to complaint was not misleading or where reliance was not reasonable.

*Scienter*

"Wilfullness" is a word of many meanings, depending upon the context in which it is used. *Zimberg v United States,* 142 F2d 132, 137-138 (CA 1, 1944).[4] A review of the case law does not reveal a clearly consistent use of the word in the context of securities fraud. See Anno: *Element of Scienter as Affecting Criminal Prosecutions for Violation of Federal Securities Law,* 20 ALR Fed 227. We find the term wilfullness as used in the Michigan act differs essentially from negligence.

To wilfully violate subsection 101(2) this defendant must have intended the omission which was found to be material and misleading. To wilfully offend subsection 101(3) he must have intended to engage in the course of conduct found to operate as a fraud. In addition, this defendant must have known or recklessly failed to discover facts that rendered his conduct violative of those subsections. It is insufficient that he could have discovered the facts by due care. On the other hand, he need not have acted with the conscious purpose to mislead or defraud. It is also unnecessary that he know his conduct violated the law.[5] Like any element of a crime, knowledge and intent can be inferred.

The trial court's finding of wilfullness in this

[4] The *Zimberg* Court noted a distinction generally between use of the word wilfull as it applies to acts bad in themselves, in which context it connotes evil purpose, and as it applies to acts not involving moral turpitude, in which context the word has no such connotation.

[5] In comparison, to be criminally liable for a violation of § 404 of the securities act, which proscribes false and misleading statements in documents filed and proceedings brought under the act, the defendant must wilfully violate the section, "knowing the statement made to be false or misleading in any material respect". MCL 451.809; MSA 19.776(409); see *United States v Peltz,* 433 F2d 48, 54-55 (CA 2, 1970).

case is not clearly erroneous. Defendant's knowledge and intent can be inferred from the entire evidence. Nothing in the record suggests the trial court applied a negligence standard.

### DEFENDANT'S CONVICTION FOR SECURITIES FRAUD AS AN INVESTMENT ADVISOR

Relevant to this case, subsection 102(a) of the Michigan Uniform Securities Act provides:

"(a) It is unlawful for any person who receives any consideration from another person primarily for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise:

"(1) To employ any device, scheme or artifice to defraud the other person.

"(2) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon the other person." MCL 451.502(a); MSA 19.776(102)(a).

Defendant's conviction under this antifraud provision cannot stand. The trial court clearly erred in finding defendant received consideration primarily for advising Mrs. LaFever as to the value of securities or their purchase or sale.

Subsection 102(a) was intended to reach persons who are specially compensated for rendition of investment advice. "The essential distinction to be borne in mind in [applying this provision to] borderline cases * * * is the distinction between compensation for advice itself and compensation for services of another character to which advice is merely incidental." Uniform Securities Act,

§ 401(f), Official Comment, *reprinted in* Loss & Cowett, Blue Sky Law, p 339.[6]

It is undisputed that defendant advised Mrs. LaFever to liquidate a portion of her stock portfolio and purchase a Puerto Rican municipal bond. As a result, she bought five Puerto Rican municipal bonds from defendant for $5,750. It does not follow, because defendant received consideration "as a result of" investment advice, that he received consideration "primarily for" the advice.

There is no direct evidence defendant received consideration primarily for investment counsel. He never billed Mrs. LaFever for advice, and she did not earmark any part of the $5,750 purchase price as payment for advice. There was no testimony that any part of the payment was for advice. Defendant's expert said none of defendant's conduct brought him within the category of an investment advisor.

Although it might be inferred that some part of the excessive markup was primarily for investment advice, we are not obliged under the "clearly erroneous" standard to uphold any finding of fact supported by some evidence.[7] " 'A finding is

---

[6] Subsection 401(f) of the act defines "investment advisor". The term "investment advisor" does not appear in subsection 102(a). Nevertheless, the official comment to subsection 401(f) is persuasive authority for interpreting the "consideration principally for investment advice" language of subsection 102(a). The general description of an investment advisor in subsection 401(f) is substantially the same as the description of persons to be reached by subsection 102(a). The term "investment advisor" does not appear in subsection 102(a) because its formal definition also includes several express exceptions, which the drafters did not wish to incorporate into the antifraud provision. See Uniform Securities Act, § 102(a), Official Comment, *reprinted in* Loss & Cowett, Blue Sky Law, p 252.

[7] "It seems sound too, that where the finding is based upon inferences drawn from admitted facts or uncontradicted evidence, the appellate court is free to draw its own inferences. But this proposition has been subject to considerable dispute. See Barron and Holtzoff, Federal Practice and Procedure § 1132." 2 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), p 597.

"clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the firm and definite conviction that a mistake has been committed.' " 2 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), p 597, quoting *United States v United States Gypsum Co,* 333 US 364, 395; 68 S Ct 525; 92 L Ed 746 (1948). Here, the direct evidence and inferences that defendant did not receive any compensation for investment advice itself clearly preponderate over the contrary inference that might be drawn from the size of the markup.

### DEFENDANT'S CONVICTION FOR OBTAINING MONEY UNDER FALSE PRETENSES

In attacking his conviction for obtaining money under false pretenses, defendant claims trial court error in holding his conduct constituted a false pretense. Defendant contends the essence of the claim against him is the charging of an excessive markup, and this is not a "false pretense". We disagree.

In determining what constitutes a false pretense, this Court has drawn a distinction between false statements of opinion and false statements of fact. Compare *People v Marks,* 12 Mich App 690; 163 NW2d 506 (1968), with *People v Wilde,* 42 Mich App 514; 202 NW2d 542 (1972). In *People v Wilde,* we stated a false opinion is not a false pretense within the meaning of the statute because persons can be expected to protect themselves from false opinions. They know such statements are subject to distortion and deceit. The Legislature only intended to provide criminal sanctions for misrepresentations of fact. Overcharges, even gross and indefensible overcharges, fall into

the category of false opinion. They are inflated opinions of value.

Notwithstanding the general distinction between opinion and fact in this area of criminal law, a dishonest statement of opinion may be a false pretense if the relationship between defendant and the victim is such that the victim cannot be expected to protect himself. Thus, "a dishonest expression of opinion may be a misrepresentation of fact suitable for false pretenses, especially where the opinion relates to a matter peculiarly within the knowledge of the one who expresses the opinion". LaFave & Scott, Criminal Law, § 90, pp 658-659. Regarding opinions of value specifically, Judge Learned Hand has spoken:

"True, the law still recognizes that in bargaining parties will puff their wares in terms which neither side means seriously, and which either so takes at his peril *(Vulcan Co. v. Simmons,* 248 F. 853 [C.C.A. 2]); but it is no longer law that declarations of value can never be a fraud. Like other words, they get their color from their setting, and mean one thing when exchanged between traders, and another when uttered by a broker to his customer. Values are facts as much as anything else; they forecast the present opinions of possible buyers and sellers, and concern existing, though inaccessible, facts. Such latitude as the law accords utterances about them, depends upon the hearer's knowledge that the utterer expects him to use his own wits * * *." *United States v Rowe,* 56 F2d 747, 749 (CA 2, 1932).

Even though defendant and Mrs. LaFever dealt in form as dealer and principal, their relationship was such that she could not be expected to protect herself from defendant's misrepresentations and omissions regarding the excessive and arbitrary nature of his markup.

Affirmed in part, reversed in part. Remanded for resentencing.