298 S.E.2d 110

**STATE of West Virginia**

v.

**Paul R. FAIRCHILD.**

**STATE of West Virginia**

v.

**Roger Ames DAMRON.**

**Nos. 15501, 15580.**

Supreme Court of Appeals of
West Virginia.

Nov. 18, 1982.

Richard A. Bush, Parkersburg, for appellant Fairchild.

Marvin A. Goldstein, and Blaine C. Myers, Parkersburg, for appellant Damron.

Silas B. Taylor, Asst. Atty. Gen., Charleston, for appellee.

McGRAW, Justice:

Roger Ames Damron and Paul R. Fairchild, the appellants in these two consolidated cases, appeal from their convictions in separate trials in the Circuit Court of Ritchie County of violations of the Uniform Securities Act, W.Va.Code §§ 32–1–101 through 32–4–418 (1982 Replacement Vol.). Damron was convicted of two counts of soliciting the sale of securities without being duly registered as a broker-dealer, two counts of the sale of unregistered securities, and two counts of sale of securities by fraud and deceit. Fairchild was convicted of two counts of aiding and abetting in the sale of unregistered securities, and one count of aiding and abetting in the sale of unregistered securities by fraud and deceit. We affirm Fairchild's convictions in Case No. 15501, and remand Case No. 15580 for the resentencing of Damron.

In March or April of 1979 Roger Ames Damron began work as a salesman for Lurray, Inc., in Huntington, West Virginia. Lurray was in the business of selling a package deal of movie film and film processing, induced by giving customers a free camera or projector. After approximately one week on the job, Damron went to Lurray's officers with a proposal to purchase the exclusive right to market Lurray's film package in the state of Kentucky. After brief negotiations, Lurray's officers agreed to sell an exclusive Kentucky franchise to Damron for $10,000. Paul Fairchild, a friend and former business associate of Damron's, was present at one of the negotiation meetings. The negotiations ultimately resulted in a written contract signed by Damron and Lurray's officers, and a down payment to Lurray of $2,000.

Although the franchise was made between Lurray and Damron in his personal capacity, Damron planned to incorporate his business and to seek investors in the project.[1] To this end Damron contacted Fairchild, who, for a fee, agreed to supply Damron with the names of potential investors and to show Damron where they lived. On April 11, 1979, Damron and Fairchild traveled to Ritchie County to visit Clyde and Claude Swadley, twin brothers whom Fairchild had suggested might be interested in Damron's venture.

Upon arriving at the Swadleys' home, Damron parked his car out of sight and went to speak to the two brothers alone. These tactics were thought necessary because in 1973 the Swadleys had purchased some stock in an apartment building in Florida from Fairchild. The project was unsuccessful and the Swadleys had engaged the assistance of an attorney to obtain a refund of their investment. Thus, as they later testified, neither of the Swadleys would have been willing to buy stock or stock subscriptions from Damron had they known Fairchild was involved. The Swadleys apparently held no such ill feelings against Damron, even though he had ac-

---

1. Articles of incorporation were subsequently prepared and a corporate charter was issued by the Secretary of State on April 20, 1979.

companied Fairchild when the Swadleys bought the stock in the apartment building.

While Fairchild remained hidden in the car, Damron told the brothers of his proposed corporation, that it involved home movies and franchises, and would readily make money. He also promised that dividends would start within four months and that the investment would pay off within a year. Damron further promised the Swadleys that if the business did not attract sufficient investors, he would refund their money. Clyde Swadley agreed to purchase 50 shares of stock for $5,000. He paid by check made out to Home Movies, the name of Damron's proposed corporation.

On May 9, 1979, after a corporate charter had been issued to Home Movies, Inc., Damron and Fairchild made a second visit to the Swadleys' home. As on the visit of April 11, Fairchild remained hidden in the car while Damron spoke to the two brothers alone. On this occasion Claude Swadley, like his brother before him, agreed to purchase 50 shares of stock for $5,000, and paid by check made out to Home Movies, Inc.

On neither visit to the Swadleys did Damron mention the involvement of Fairchild. He did not tell the Swadleys that their names had been provided by Fairchild, that Fairchild had shown him the way to their home, or that Fairchild was waiting outside in the car. Further, Damron did not tell the Swadleys that a portion of their investments would be paid to Fairchild as a "consulting fee."

After each of these visits to the Swadleys, Fairchild received a $1,500 "consulting fee" paid out of corporate funds. Also after each sale of stock to the Swadleys, Damron withdrew the same amount from the corporate account as an "advance on Kentucky rights." At the time of each sale to the Swadleys, the stock of Home Movies, Inc., was not registered as a security with the State Auditor, and, although previously licensed in the past, neither Damron nor Fairchild were registered security broker-dealers, agents, or investment counselors in 1979.

In early June 1979, Damron again traveled to Ritchie County to attempt to sell the Swadleys $10,000 more worth of stock. Claude Swadley was at home alone on this occasion and refused Damron's offer to buy any additional shares in Home Movies, Inc. He did, however, provide Damron with the names of three persons who might be interested in the venture. Approximately one week later, Damron informed Claude that none of the three were willing to purchase stock in Home Movies, Inc.

When Clyde Swadley learned of Damron's visit to his brother he became concerned about Damron's apparent lack of progress with Home Movies, Inc. Consequently, Clyde contacted the Securities Division of the State Auditor's office to check into the matter. The Deputy Commissioner of Securities subsequently began an investigation into Damron's dealings with the Swadleys.

When Damron learned of the investigation he telephoned the Swadleys and offered to refund their investment if they would agree not to press their complaint with the State Auditor. In lieu of a cash refund, Damron offered to give the Swadleys some furniture. They refused this offer. Damron subsequently sent the Swadleys an unsecured promissory note for the amount of their investment. The Swadleys refused to accept the note as payment, and sent it instead to the Securities Division of the State Auditor's office.

The Deputy Commissioner's investigation ultimately resulted in the indictment and subsequent conviction of Damron and Fairchild.

### No. 15501

Fairchild makes five assignments of error: 1) the trial court erred in overruling the appellant's motion to quash and his motion for a bill of particulars, directed to one count of the indictment; 2) the trial court erred in admitting into evidence hearsay testimony of a codefendant; 3) the trial court erred in admitting into evidence without proper foundation certain business records; 4) the State failed to prove that the securities sold were not exempt from the statutory registration requirement;

and 5) the State failed to prove that the appellant's actions were willful violations of the law.

## I.

Fairchild's first assignment of error is that the eighth count of the indictment failed to adequately inform him of the nature of the charge against him and that therefore, the trial court erred in refusing to grant either his motion to quash or his motion for a bill of particulars. The eighth count of the indictment provides:

> That Paul R. Fairchild, from on or about the 11th day of April, 1979, to on or about the _____ day of June, 1979, in the County of Ritchie, willfully, unlawfully and feloniously did aid and abet the said Roger A. Damron, in the sale of subscriptions to and orders for a certain security to-wit: Shares of the Common Capital Stock of a corporation called "Home Movies, Inc.", to Clyde W. Swadley and Claude W. Swadley for value, said subscriptions being a security as defined by the West Virginia Uniform Securities Act of 1974, as amended, by means of acts, practices, transactions and a course of business which operated and would operate as a fraud and deceit upon the purchasers of said subscriptions as follows:
>
> (a) the said accused, Paul R. Fairchild, acted as an advisor in the solicitation of said purchasers and accompanied and directed said accused, Roger A. Damron, to the residence of said purchasers on the occasions of the solicitations and sales, and received a fee for said actions from Roger A. Damron out of the proceeds of the payments for said subscriptions and fraudulently concealed said conduct from said purchasers against the peace and dignity of the State;

This count of the indictment substantially follows the language of W.Va.Code § 32-1-101(3), which provides: "It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly ... [t]o engage in any act, practice or course of business which

operates or would operate as a fraud or deceit upon any person."

We have previously held that "[a]n indictment ... for a statutory offense is sufficient if, in charging the offense, it substantially follows the language of the statute, fully informs the accused of the particular offense with which he is charged and enables the court to determine the statute on which the charge is based." *State v. Eden*, 163 W.Va. 370, 256 S.E.2d 868, 878 (1979); *see also State v. Knight*, 168 W.Va. 615, 285 S.E.2d 401 (1981); *State v. Barnett*, 168 W.Va. 361, 284 S.E.2d 622 (1981); *State v. Slie*, 158 W.Va. 672, 213 S.E.2d 109 (1975); *Pyles v. Boles*, 148 W.Va. 465, 135 S.E.2d 692 (1964); *State v. Taylor*, 130 W.Va. 74, 42 S.E.2d 549 (1947). Count VIII of the indictment fulfills these requirements. The indictment substantially follows the language of W.Va.Code § 32-1-101(3) and presents detailed information regarding the time, location, parties involved, victims, and the particular actions of the appellant that constituted a violation of the statute. The trial court was therefore correct in denying the appellant's motion to quash.

The appellant's contention that the trial court erred in refusing to grant his motion for a bill of particulars is also without merit. As a general rule, "[t]he granting or denial of a motion for a bill of particulars ... rests in the sound discretion of the trial court, and unless it appears that such discretion is abused the ruling of the trial court will not be disturbed." Syllabus Point 7, in part, *State v. Nuckols*, 153 W.Va. 736, 166 S.E.2d 3 (1969), *quoting* Syllabus Point 2, *State v. Riley*, 151 W.Va. 364, 151 S.E.2d 308 (1966); *see also State v. Petry*, 166 W.Va. 153, 273 S.E.2d 346 (1980); *State v. Dudick*, 158 W.Va. 629, 213 S.E.2d 458 (1975). In the present case the appellant's motion for a bill of particulars was not presented to the court until the morning of trial, yet the prosecutor had employed an "open file" policy with defense counsel since the date of indictment. Thus, the appellant already had access to any information discoverable through a bill of particulars. We therefore conclude that

the trial court did not abuse its discretion in denying the appellant's motion.

## II.

■ The appellant next complains that evidence of statements made by Damron to the Swadleys concerning Home Movies, Inc., should have been excluded as hearsay. In admitting such testimony the trial court relied upon *Conway v. Bailey,* 91 W.Va. 324, 112 S.E. 579 (1922), where it was held, in syllabus point 6, that "[i]f it has been *prima facie* shown that [a] scheme to defraud was devised by the defendants and jointly promoted by them, then declarations in furtherance thereof, made by any one of them, though the others were not present, are competent evidence against all the parties to the scheme." The appellant characterizes this rule as an exception to the hearsay rule and argues that it was inapplicable below because the State failed to meet its burden of laying an independent foundation for the admission of Damron's hearsay statements.

Initially, it should be recognized that the statements in issue are original evidence and not hearsay. It is generally accepted that hearsay evidence consists of extrajudicial statements offered to prove the truth of the matter asserted. *See, e.g.,* 5 J. Wigmore, *Evidence* § 1361 (Chadbourn Rev. 1974); C. McCormick, *Evidence* § 246 (2d ed. 1972); D. Binder, *The Hearsay Handbook* 3 (1975). The representations made by Damron to the Swadleys, however, were not offered to prove the truth of those representations. Indeed, it was the prosecution's theory at trial that the statements were false and were uttered to perpetrate a fraud upon the Swadleys. Thus, the prosecution was attempting to show the mere fact that such statements were uttered by Damron, not the truth of his representations. Declarations such as these are often held admissible as "acts" of the conspiracy, not as an exception to the hearsay rule. *See* D. Davenport, *The Confrontation Clause and the Co-Conspirator Exception*

*in Criminal Prosecutions: A Functional Analysis,* 85 Harv.L.Rev. 1378, 1398 (1972). *See also* P. Marcus, *Prosecution and Defense of Criminal Conspiracy Cases* § 5.02[1] at 5–6 (1978).

Nevertheless, the requirement enunciated in *Conway* that there must be a *prima facie* showing that a conspiracy was devised by the defendants and jointly promoted by them is applicable to these circumstances, not to insure the reliability of the statements, but to show their relevance and connection to the defendant. Thus, the holding in *Conway* that evidence of acts or declarations of co-conspirators or co-actors is admissible only if a proper foundation, or *prima facie* case, is established, remains viable in this situation. The required foundation consists of: (1) proof of a conspiracy existing between the declarant and the defendant; and (2) proof that the act or declaration was made during and in pursuance of the conspiracy or joint enterprise. *State v. Robinson,* 97 W.Va. 691, 127 S.E. 46 (1924). *See also Lutwak v. United States,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953); F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* 362 (1978). The foundation must be established independently of the declaration itself, *United States v. Nixon,* 418 U.S. 683, 693, 94 S.Ct. 3090, 3100, 41 L.Ed.2d 1039 (1974); *State v. Robinson, supra,* but may be shown by circumstantial evidence. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The court may admit evidence of acts or declarations of a coconspirator without preliminary proof, subject to the condition that the statement must ultimately be excluded and the jury instructed to disregard it if a proper foundation is not subsequently laid.[2] *See, e.g., Floyd v. Commonwealth,* 219 Va. 575, 249 S.E.2d 171 (1978); F. Cleckley, *Handbook on Evidence for West Virginia Lawyers, supra.*

■ The appellant contends the foundation laid by the State for the admissibility of Damron's statements to the Swadleys

---

**2.** Some courts have established explicit guidelines to be followed when the statement is conditionally admitted in this manner. *See, e.g.,*

*United States v. Stanchich,* 550 F.2d 1294, 1298 (2d Cir.1977).

was deficient because the existence of a conspiracy was not shown by independent evidence. Generally, in order to prove the existence of a conspiracy, the State must show: (1) an agreement between two or more people to accomplish an illegal objective, or to accomplish a legal objective by illegal means; (2) an overt act in furtherance of the objective; and (3) an intent to commit the underlying offense. *See State v. Less,* 170 W.Va. 252, 294 S.E.2d 62 (1982); 4A Michie's Jurisprudence, *Conspiracy* §§ 5–7 (1974 Replacement Vol.). The appellant argues that the State's foundation fails in this case because there was no showing of an agreement to accomplish an illegal objective. He bases this argument on his assertion that the evidence presented by the State indicated that although Fairchild knew Damron was selling unregistered stock, he believed that the stock was exempt from registration.

■ The quantity of independent evidence necessary to show the existence of a conspiracy as a foundation for the admissibility of the out-of-court statement of a coconspirator has been described in a variety of manners by different courts. For example, in *State v. Thompson,* 273 Minn. 1, 139 N.W.2d 490, *cert. denied,* 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966), the court held that a *prima facie* case was made if there was sufficient independent evidence to permit the trial court reasonably to infer that a conspiracy existed. California has held that the *prima facie* case need not be shown by proof beyond a reasonable doubt or even by a preponderance of the evidence, but may be shown by any competent evidence that tends to show a conspiracy existed. *People v. Jourdain,* 111 Cal.App.3d 396, 168 Cal.Rptr. 702 (1980). Alaska has adopted a preponderance of the evidence standard of proof, *Hawley v. State,* 614 P.2d 1349 (Alaska 1980), as have the first and second circuits. *United States v. Martorano,* 557 F.2d 1 (1st Cir.), *reh. denied* 561 F.2d 406 (1977); *United States v. Margiotta,* 688 F.2d 108 (2d Cir.1982). Still other courts speak in terms of substantial evidence, *United States v. Nixon, supra; United States v. Holder,* 560 F.2d 953 (8th Cir.1977); *United States v. Testa,* 548 F.2d 847 (9th Cir. 1977), while others appear to decide the issue on a case by case basis. *See* cases collected at 16 Am.Jur.2d, *Conspiracy* § 46 at 28–30 (Cum.Supp.1982). Whichever standard is applied, the sufficiency of the evidence is a question of admissibility to be decided by the trial judge. *United States v. Nixon, supra.*

■ In the present case the State presented independent evidence that Fairchild was present at early negotiations between Damron and Lurray, Inc., for the Kentucky franchise rights, that Fairchild agreed to supply Damron with names of potential investors and to show Damron where they lived, that Fairchild traveled with Damron to Ritchie County to show Damron where the Swadleys lived, that Fairchild had previous dealings with the Swadleys, that the Swadleys would not have purchased stock from Damron had they known Fairchild was involved, that Fairchild remained out of sight while Damron sold shares of stock to the Swadleys, and that Fairchild received a fee of $1,500 after each sale of stock by Damron.

Regardless of whether Fairchild believed the stock was exempt from registration, the independent evidence presented by the State, even when viewed under the most stringent standard of proof adopted by the courts discussed above, is sufficient to establish a conspiracy to defraud the Swadleys under W.Va.Code § 32–1–101. Fairchild's self-serving statements that he believed his actions to be legal do not cause the foundation laid by the State to crumble.

Fairchild further contends that the rule enunciated in *Conway v. Bailey, supra,* was tacitly overruled by this Court in *State v. Adkins,* 162 W.Va. 815, 253 S.E.2d 146 (1979). We disagree. In *Adkins* the defendant was convicted of felony murder upon the testimony of an accomplice who was present when the killing took place. On appeal the defendant cited syllabus point two of *State v. Price,* 114 W.Va. 736, 174 S.E. 518 (1934), for the proposition that a defendant cannot be convicted on the admission or confession of a co-conspirator

after the conspiracy has ended. Syllabus point two of *State v. Price, supra,* provides:

Declarations and admissions of an accomplice or coconspirator made during the continuance of the conspiracy and before its object is accomplished are admissible in evidence as against all persons participating in the conspiracy, even though they were not present when such declarations or admissions were made, provided that, before such declarations or admissions are admitted in evidence, the state has established the conspiracy by prima facie proof.

The Court in *Adkins* rejected the defendant's argument as inappropriate to the facts of the case, and overruled syllabus point two of *Price,* reasoning:

The meaning of *State v. Price* ... is that the admission or confession of an accomplice either by way of a plea of guilty to the crime or in any other out-of-court statement cannot be introduced in evidence under some theory of agency as an admission against interest binding upon all participants in the conspiracy. To permit such an admission to be introduced against another accomplice would be an extension of the civil law of agency and partnership into the criminal field. Consequently, while an admission or confession alone cannot be introduced into evidence, there is absolutely no prohibition against testimony by an accomplice witness implicating the defendant in the crime when the defendant has an opportunity to cross-examine the accomplice and the accomplice is available in court for that purpose or his testimony and cross-examination is appropriately preserved in some other manner.

162 W.Va. at 820, 253 S.E.2d at 150.

*Adkins* is distinguishable from the case at hand because we are not here dealing with the admission or confession of an accomplice or co-conspirator made after the termination of the conspiracy. The statements admitted below were representations made by Damron to the Swadleys concerning the nature and profitability of Home Movies, Inc. Standing alone, they do not constitute an admission against interest nor a confession. Neither do they implicate Fairchild in any criminal activity. They were not offered to prove the truth of the matter asserted, but merely to show that such statements were uttered. The appellant's argument based on *State v. Adkins, supra,* is therefore, inappropriate to the facts of this case.

█ In like manner, the appellant's argument that admission of Damron's statements violates his right to cross-examine the witnesses against him, as guaranteed by the confrontation clause of the Sixth Amendment, is also inappropriate. The appellant relies upon *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), for his proposition. In *Roberts,* the United States Supreme Court held that when a hearsay declarant is not present for cross-examination at trial, the Sixth Amendment's confrontation clause normally requires a showing that he is unavailable, and even then, his statement is admissible only if it bears adequate "indicia of reliability."

The holding in *Roberts* is inapplicable to this case because, as we have discussed, we are not here dealing with hearsay testimony. Damron's statements were not offered to prove the truth of the matter asserted, but simply to show that such statements were made. Regardless of the actual truth of the statements, cross-examination of the witnesses who claimed to have heard them is a sufficient guaranty of the reliability of the fact that they were uttered. The appellant's second assignment of error is without merit.

### III.

Fairchild next argues that the checking ledger of Home Movies, Inc., was improperly admitted under the business entry exception to the hearsay rule because a proper foundation was not laid for its admission. The checking ledger is purported to contain a listing of the withdrawals made by Damron from the corporate checking account of Home Movies, Inc. The ledger contains the number, date, and amount of each check written, who it was issued to, and in

payment of what liability. Six of the entries are in payment of "consulting fees" to Paul R. Fairchild in the total amount of $5,200. Two of the checks, each for $1,500, were issued the day after each visit to the Swadleys.

 The common-law business entry exception to the hearsay rule has long been recognized in West Virginia, *see, e.g., State v. Martin,* 102 W.Va. 107, 134 S.E. 599 (1926); *Marfuti v. Daniels,* 99 W.Va. 673, 129 S.E. 709 (1925); *State v. LaRue,* 98 W.Va. 677, 128 S.E. 116 (1925); *Deitz v. McVey,* 77 W.Va. 601, 87 S.E. 926 (1916); *Griffith v. American Coal Co.,* 75 W.Va. 686, 84 S.E. 621 (1915); *West Virginia Architects & Builders v. Stewart,* 68 W.Va. 506, 70 S.E. 113 (1911), and was recently discussed at length in *Tedesco v. Weirton General Hospital,* 160 W.Va. 466, 235 S.E.2d 463 (1977), and *Hill v. Joseph T. Ryerson & Son, Inc.,* 165 W.Va. 22, 268 S.E.2d 296 (1980). Professor Cleckley describes the exceptions as follows:

> Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, if made in the regular course of any business and if it was the regular course of such business to make such memorandum or record at the time of the act, transaction, occurrence, or event, or within a reasonable time thereafter, is admissible as an exception to the hearsay rule.

F. Cleckley, *Handbook on Evidence for West Virginia Lawyers, supra,* at 380 (emphasis omitted).

The basis for the exception is that records made routinely in the regular course of business, at the time of the transaction or occurrence, or within a reasonable time thereafter, are generally trustworthy and reliable, and therefore ought to be admissible when properly verified. *See Hill v. Joseph T. Ryerson & Son, Inc., supra; State v. LaRue, supra; Deitz v. McVey, supra. See also* 5 J. Wigmore, *Evidence, supra,* at § 1422; C. McCormick, *Evidence, supra,* at § 306.

 It is not necessary that the maker of the record be called to testify to verify the authenticity of the entry. *State v. Martin, supra; State v. LaRue, supra.* The trustworthiness of the entry may be established by the testimony of a custodian of the business record who can "adequately demonstrate the regularity of the particular record keeping as an established procedure within the business routine." *Hill v. Joseph T. Ryerson & Son, Inc., supra,* 165 W.Va. at 42, 268 S.E.2d at 309. *See also* C. McCormick, *Evidence, supra,* at § 312. However, in no instance may records of this kind prove themselves. *Woodrum Home Outfitting Co. v. Adams Express Co.,* 90 W.Va. 161, 110 S.E. 549 (1922).

 In the instant case, the State called Damron to authenticate the checking ledger, but Damron declined to testify, citing his constitutional right against self-incrimination. Subsequently, the State called Kyle King, the Assistant Deputy Securities Commissioner to the stand. King identified the checking ledger as a document which Damron had tendered in response to a subpoena duces tecum for the business records of Home Movies, Inc., at an investigative hearing conducted by the Division of Securities of the State Auditor's office. The ledger was then admitted into evidence, over defense counsel's hearsay objection, as a business record exception to the hearsay rule.

We must agree with the appellant that a proper foundation was not laid for admission of the checking ledger as a business record. No testimony was adduced to show that the entries in the checking ledger were made in the regular course of business, that the entries were made at or near the time the checks were issued, or even that the person who made the entries was an employee of Home Movies, Inc. Without such a preliminary showing the checking ledger should not have been admitted.

However, we note that the record does contain evidence independent of the checking ledger which demonstrates that Fairchild received corporate funds for helping Damron solicit sales in Home Movies, Inc., and that Fairchild knew the money he received came from funds given Damron by

investors Fairchild had recommended. Consequently, we do not believe admission of the checking ledger is sufficiently prejudicial to require reversal of Fairchild's conviction.

## IV.

Fairchild next contends that the State failed to prove every material element of the charge against him beyond a reasonable doubt as required by *State v. Pendry,* 159 W.Va. 738, 227 S.E.2d 210 (1976). He argues that the State failed in its burden of proving that the securities sold by Damron were not subject to any of the statutory exceptions to registration contained in W.Va.Code § 32–4–402. The State argues that it is under no obligation to carry this burden, but rather that the burden of proving an exemption from the registration requirement is upon the one who claims it.

W.Va.Code § 32–3–301 provides: "It is unlawful for any person to offer or sell any security in this State unless (1) it is registered under this chapter or (2) the security or transaction is exempted under section 402." Section 402 lists numerous statutory exemptions to the registration requirement. Fairchild contends the securities sold by Damron were exempt from registration under the provisions of W.Va.Code § 32–4–402(b)(9). That section provides that a security is exempt from registration if the:

> transaction [is] pursuant to an offer directed by the offeror to not more than ten persons ... in this State during any period of twelve consecutive months ... if (A) the seller reasonably believes that all buyers in this State ... are purchasing for investment, and (B) no commission or other remuneration is paid or given directly or indirectly for soliciting any prospective buyer in this State ... but the commissioner may by rule or order, as to any security or transaction, withdraw or further condition this exemption, or increase or decrease the number of offers permitted, or waive the conditions in clauses (A) and (B) with or without the substitution of a limitation or remuneration.

It is not contended that any of the other exceptions contained in W.Va.Code § 32–4–402 apply to Damron's sales of securities. The basis of the State's argument, that the burden of proving the exception rests on the appellant, is found in W.Va.Code § 32–4–402(d), which provides: "In any proceeding under this chapter, the burden of proving an exemption from a definition is upon the person claiming it."

Several courts in other states which have adopted the Uniform Securities Act have addressed the issue of whether this language unconstitutionally shifts the burden of proof on a material element of the offense to the defendant in a criminal case. These cases indicate that the prosecution is not required to prove the non-existence of an exemption as an element of the crime charged. Rather, they hold that the existence of an exemption is an affirmative defense, which the defendant must put in issue before the prosecution is required to establish the contrary beyond a reasonable doubt. *Commonwealth v. David,* 365 Mass. 47, 309 N.E.2d 484 (1974); *People v. Dempster,* 396 Mich. 700, 242 N.W.2d 381 (1976); *State v. Goetz,* 312 N.W.2d 1 (N.D. 1981). The United States Supreme Court sanctioned this general approach in *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977).

The validity of this approach in West Virginia is questioned by the appellant in light of the holdings in *State v. Harless,* 105 W.Va. 480, 143 S.E. 151 (1927); *State v. Taylor,* 95 W.Va. 518, 121 S.E. 573 (1924); *State v. Harr,* 77 W.Va. 637, 88 S.E. 44 (1916); and *State v. Richards,* 32 W.Va. 348, 9 S.E. 245 (1889), that a warrant or indictment charging a statutory offense which fails to negative the exceptions contained in the enacting clause of the statute is fatally defective. *See also State v. McCoy,* 107 W.Va. 163, 148 S.E. 127 (1929). The appellant argues that the nonexistence of a statutory exemption is a material element of the offense charged, which under *State v. Pendry, supra,* the State must prove beyond a reasonable doubt, without the benefit of any presumptions in its favor, and without requiring the

defendant either to introduce evidence to rebut the presumption, or to carry the burden of proving the contrary.

We find it unnecessary to address the issue of whether W.Va.Code § 32–4–402(d) unconstitutionally shifts the burden of proof on a material element of the offense to the defendant, because all the requirements of *State v. Pendry, supra,* and *State v. Harless, supra,* were met below. The record reveals the State alleged in the indictment that the securities sold by Damron were not exempt from registration, that the State offered proof that the securities were not exempt under W.Va.Code § 32–4–402(b)(9), the only arguably applicable exemption,[3] and that the trial court instructed the jury that the burden was upon the State to prove beyond a reasonable doubt that the securities were not exempt from the registration requirement.[4] Thus, even under the holding of *State v. Harless, supra,* that the State bears the burden of proving beyond a reasonable doubt the nonexistence of a statutory exemption, the burden was met by the State in this case.

## V.

Finally, Fairchild contends that the evidence was insufficient to submit the issue of guilt to the jury because the State failed to show a willful and intentional violation of the law, as required by W.Va.Code § 32–4–409.[5] The appellant argues that *State v. Dunn,* 162 W.Va. 63, 246 S.E.2d 245 (1978), is controlling in this situation. In *Dunn* the defendant assigned as error the trial court's failure to instruct the jury that intent and knowledge are necessary elements of the offense of delivery of a controlled substance. The State argued that intent was not an element of the offense. We held that knowledge or intent must be proved by the State in order to convict for the felony of delivery of a controlled substance. Quoting from *State v. Frisby,* 161 W.Va. 734, 245 S.E.2d 622, 644 (1978), we reasoned that "[A]ll common law crimes require a *mens rea,* and what a person intended is always a question for jury determination under all the facts and circumstances. There is no reason to treat a statutory case any differently." 162 W.Va. at 73, 246 S.E.2d at 252.

However, *Dunn* is distinguishable from the case at hand. The jury below was instructed on several occasions that the State had the burden of proving beyond a reasonable doubt that Fairchild willfully participated in the scheme to defraud the Swadleys.[6] The issue in this case is wheth-

---

**3.** The evidence adduced below showed that after each sale of stock to the Swadleys, Damron received $1,500 as an "advance on Kentucky rights", and Fairchild received the same amount in "consulting fees." These payments are sufficient to negative the exception to registration contained in W.Va.Code § 32–4–402(b)(9), which exempts only transactions in which "no commission or other remuneration is paid or given directly or indirectly for soliciting any prospective buyer in this State . . . ." *See, e.g., Schultz v. Rector-Phillips-Morse, Inc.,* 261 Ark. 769, 552 S.W.2d 4 (1977). Statutory exemptions to the registration requirement should be given a limited, rather than an expansive construction. *Rzepka v. Farm Estates, Inc.,* 83 Mich.App. 702, 269 N.W.2d 270 (1978).

**4.** For example, the jury was instructed that, "the State of West Virginia must . . . prove to the satisfaction of the jury beyond a reasonable doubt that . . . [the] security or transaction is not exempted by law from . . . registration."

**5.** The statute provides, in pertinent part: "Any person who willfully violates any provision of this chapter . . . shall be guilty of a felony . . . ." W.Va.Code § 32–4–409.

**6.** Traditionally, it has been held that specific intent is not an element of a violation of the Uniform Securities Act. For example, in *State v. Hodge,* 204 Kan. 98, 701, 460 P.2d 596, 604 (1969), the Supreme Court of Kansas held: "No specific intent is necessary to constitute the offense where one violates the securities act except the intent to do the act denounced by the statute." The court in *Hodge* quotes from L. Loss and M. Cowett, *Blue Sky Law* at 273 (1958), where it is stated in reference to the term "willfully" as used in the Uniform Securities Act:

As the federal courts and the SEC have construed the term "willfully" in § 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 780(b), all that is required is proof that the person acted intentionally in the sense that he was aware of what he was doing . . . .

*Accord, People v. Cook,* 89 Mich.App. 72, 279 N.W.2d 579 (1979); *but see Hentzher v. State,* 613 P.2d 821 (Alaska 1980) (proof of specific intent is an element of violation of securities act where particular offense is *malum prohibitum,* not *malum in se* ).

er there was sufficient evidence of willfulness to support the charge and take the issue to the jury.

█ The test this Court will apply in determining the sufficiency of the evidence on appeal of a criminal conviction is stated in syllabus point one of *State v. Starkey*, 161 W.Va. 517, 244 S.E.2d 219 (1979):

> In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt. The evidence is to be viewed in the light most favorable to the prosecution. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done.

█ We conclude that the evidence presented below, when viewed in the light most favorable to the prosecution, is sufficient to convince impartial minds of the guilt of the appellant beyond a reasonable doubt of a willful violation of the Uniform Securities Act. The evidence adduced by the State showed that Fairchild was a previously licensed and experienced securities broker-dealer who had passed the National Association of Securities Dealers examination. The jury could have inferred from this evidence that the appellant was familiar with securities law. The evidence also shows that Fairchild intentionally remained out of sight while Damron negotiated with the Swadleys, which fact supports an inference of guilty knowledge and an intent to deceive. Guilty knowledge may be shown by circumstantial evidence. *State v. Dunn, supra*. The trial court properly

denied the appellant's motion for a directed verdict.

## No. 15580

Damron's principal assignments of error[7] are: 1) the State employed repeated leading questions of its witnesses to such an extent that it prejudiced the appellant and requires reversal of his conviction; 2) the State failed to meet its burden of presenting a *prima facie* case that the appellant was a broker-dealer, and that the securities sold by the appellant were not subject to an exemption from the registration requirement; 3) the State failed to prove beyond a reasonable doubt that acts of fraud and deceit were committed by the appellant; 4) the trial court erred by admitting into evidence a transcript of the appellant's hearing before the State Auditor's Securities Division; and 5) two counts of indictment subjected the appellant to convictions of two felonies for the same act.

## I.

█ Damron's first assignment of error is that the prosecution employed leading questions of the State's witnesses to an extent which requires reversal of his conviction. This assignment of error is without merit. As a general rule, the use of leading questions is not permitted on direct examination. *See, e.g., Hendricks v. Monongahela West Penn Serv. Co.*, 111 W.Va. 576, 163 S.E. 411 (1932). However, there are numerous exceptions to the general rule, *see* F. Cleckley, *Handbook on Evidence for West Virginia Lawyers, supra*, at 55–56, and the allowance of leading questions rests largely in the discretion of the trial court. *State v. Davis*, 139 W.Va. 645, 81 S.E.2d 95 (1954). Absent an abuse

---

7. Errors assigned which will not be addressed because they are not argued or briefed, *see State v. Buck*, 170 W.Va. 428, 294 S.E.2d 281 (1982); *Addair v. Bryant*, 168 W.Va. 306, 284 S.E.2d 374 (1981), include: 1) the trial court erred by permitting a witness to read an exhibit to the jury, rather than permit the exhibit to speak for itself; 2) the trial court eroded the appellant's presumption of innocence by instructing the jury at several recesses not to make a determination of the appellant's "guilt or innocence"; 3) certain of the court's instructions were misleading and confusing; and 4) the trial court erred in refusing one of the appellant's instructions. Furthermore, review of the record indicates that the appellant's contentions that the trial court erred by admitting into evidence certain exhibits as improper corroboration of witness testimony, and that the trial court permitted the State to introduce improper rebuttal testimony, are without merit. *See State v. Putnam*, 157 W.Va. 899, 205 S.E.2d 815 (1974).

of such discretion, the trial court's ruling will not be disturbed. *See Layne v. Chesapeake & Ohio R. Co.*, 66 W.Va. 607, 67 S.E. 1103 (1909).

■ Although the record indicates that numerous leading questions were employed below by the prosecution in questioning Clyde and Claude Swadley, in the vast majority of these instances the use of leading questions was not objected to by defense counsel. The record further indicates that of the objections to leading questions that were made by defense counsel, the majority were sustained by the trial court. Defense counsel's failure to object to leading questions may have been a valid tactical choice. In any event, he cannot raise the issue for the first time on appeal. *State v. Baker*, 169 W.Va. 357, 287 S.E.2d 497 (1982); *State v. Burton*, 163 W.Va. 40, 254 S.E.2d 129 (1979); *State v. Starkey*, 161 W.Va. 517, 244 S.E.2d 219 (1978); *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974).

## II.

The appellant next contends that the State failed to meet its burden of proving (A) that Damron was a broker-dealer as charged in the indictment, and (B) that the securities sold by Damron were not subject to an exemption from the registration requirement.

### (A)

■ The Uniform Securities Act defines a "broker-dealer" as "any person engaged in the business of effecting transactions in securities for the account of others or for his own account." W.Va.Code § 32–4–401(c). It is unlawful for any person to transact business in West Virginia as a securities broker-dealer or agent unless he is registered with the Division of Securities. W.Va.Code § 32–2–201(a). Two counts of the indictment charged Damron with soliciting the sale of securities without being registered as a broker-dealer. Damron's principal defense to these two counts was that he was an "issuer" and not a broker-dealer. An "is-

suer" is defined by the Uniform Securities Act as "any person who issues or proposes to issue any security ...." W.Va.Code § 32–4–401(g). Issuers are not required to register under the Act. *See* W.Va.Code §§ 32–4–401(c)(2); 32–2–201(a).

The burden upon the State in this case was to prove beyond a reasonable doubt that the appellant was a broker-dealer, and not an issuer. The evidence adduced below shows that the sales solicited by Damron were for stock to be issued by Home Movies, Inc., and not by Damron in his personal capacity. This evidence is sufficient to convince impartial minds that the appellant was a broker-dealer within the terms of the Act beyond a reasonable doubt. *See State v. Starkey, supra.*

### (B)

■ The appellant's contention that the State failed to meet its burden of presenting a *prima facie* case that the securities sold by Damron were not subject to a statutory exemption is without merit. The exemption which Damron claims applies to this case is found in W.Va.Code § 32–4–402(b)(9). An element of this exemption requires that "no commission or other remuneration is paid or given directly or indirectly for soliciting any prospective buyer in this State ...." The evidence adduced below showed that Damron received $1,500 after each sale to the Swadleys. Such evidence is sufficient to negative the claimed exemption.[8]

## III.

■ The appellant next argues that the State failed to prove beyond a reasonable doubt that acts of fraud and deceit were committed by Damron. In support of his argument the appellant contends that the allegation contained in the indictment that Damron represented to the Swadleys that their investment would be placed in escrow, was not supported by the evidence. We note that the evidence is conflicting on this

---

8. *See* footnote 3, *supra.*

point.[9] However, any variance between the indictment and the proof arising out of this conflict is immaterial. The variance between the indictment and the proof is considered material only where the variance misleads the defendant in presenting his defense to the charge and exposes him to the danger of being put in jeopardy again for the same offense. *See State v. Crowder*, 146 W.Va. 810, 123 S.E.2d 42 (1961); *State v. Nelson*, 121 W.Va. 310, 3 S.E.2d 530 (1939). *See also Davidson v. Boles*, 266 F.Supp. 645 (N.D.W.Va.1967). Neither of these dangers is present here.

■ The appellant further contends that the evidence is insufficient to prove that Damron represented to the Swadleys that dividends would be paid. This contention is not supported by the record. Both Clyde and Claude Swadley testified that Damron said dividends would be paid twice per month. The evidence presented by the State was sufficient to prove beyond a reasonable doubt that acts of fraud and deceit were committed by the appellant.

## IV.

At Damron's trial, a transcript of a hearing held before the Deputy Commissioner of Securities, at which Damron testified, was offered by the State as evidence. The testimony contained in the transcript concerns Damron's dealings with the Swadleys, and his and Fairchild's involvement with Home Movies, Inc. After an *in camera* hearing, at which it was determined that Damron's statement was voluntarily given after a valid waiver of rights, the trial court admitted the transcript into evidence, over the appellant's objection, and it was read to the jury.

The appellant contends that W.Va.Code § 57–2–3 (1966) prohibits admission of the transcript. The statute provides: "In a criminal prosecution other than for perjury or false swearing, evidence shall not be given against the accused of any statement made by him upon a legal examination." The appellant contends he did not waive his rights under W.Va.Code § 57–2–3 because no mention of the statute was made to him prior to or during his testimony before the Division of Securities. The State argues that the issue raised by the appellant is not properly before this Court because no specific objection based on W.Va.Code § 57–2–3 was presented to the trial court.

■ We agree with the State that the appellant's assignment of error based on W.Va.Code § 57–2–3 was not preserved below. It is well established in West Virginia that:

[W]here the objection to the admission of testimony is based upon some specified ground, the objection is then limited to that precise ground and error cannot be predicated upon the overruling of the objection, and the admission of the testimony on some other ground, since specifying a certain ground of objection is considered a waiver of other grounds not specified.

*Leftwich v. Inter Ocean Casualty Co.*, 123 W.Va. 577, 585–586, 17 S.E.2d 209, 213 (1909) (Kenna, C.J., concurring).

9. For example, Clyde Swadley testified:

Q. Mr. Swadley, did you say anything to Mr. Damron when you gave him the $5,000.00 check?
A. I asked him what he was going to do with it if he didn't get in business. He says, I will have to give her back to ya.

However, Clyde later stated an escrow account was not discussed:

Q. Did you ever discuss an escrow account with Mr. Damron?
A. No, sir.
Q. You never discussed an escrow account with Mr. Damron?
A. No.

On the other hand, Claude Swadley testified:

Q. Did you have any idea or did he ever say anything at all about what would happen if his business did not go?
A. Oh, we were supposed to get our money back if he did not get goin'.

Claude further testified that he understood Damron would place their money in an escrow account:

Q. The word "escrow," do you have an idea of what that word means?
A. It means put your money in the bank and leave it in there until you get the business sold out.
Q. Is that what you understood Mr. Damron would do with your money?
A. Yes. That's what I kind of understood he was going to do.

In *State v. Plantz,* 155 W.Va. 24, 45, 180 S.E.2d 614, 627 (1971), this Court stated that under W.Va.Code § 57–2–3 statements made upon a legal examination "could not have been admitted in evidence against the defendant upon the trial *if objected to by him.*" (Emphasis added). A review of the record below indicates that the statement admitted into evidence in the State's case-in-chief was objected to on several grounds, all of which were properly overruled, but that the theory now raised by the appellant, that admission of the statement violates W.Va.Code § 57–2–3, was not presented to the trial court. A majority of the Court believes that the failure of the appellant to offer an objection based on W.Va.Code § 57–2–3 at trial operates as a waiver of that objection on appeal. *State v. Baker, supra; State v. Moran,* 168 W.Va. 688, 285 S.E.2d 450 (1981); *State v. Burton, supra; State v. Thomas, supra.*

Moreover, inspection of the transcript clearly indicates that the appellant voluntarily testified before the Deputy Commissioner with the full realization that his statements would be used against him in any subsequent criminal prosecution. Prior to testifying, the appellant was warned that anything he said could be used against him in court, and that any information he gave indicating unlawful activity would be referred to the proper prosecuting attorney for criminal prosecution. The appellant was further informed that the Deputy Commissioner would not employ his contempt powers should the appellant refuse to testify. After being given these warnings, the appellant, who had counsel present to advise him at the hearing, voluntarily agreed to answer the Deputy Commissioner's questions. Under these circumstances we believe the appellant waived any objection based on W.Va.Code § 57–2–3 to the use of his testimony at a subsequent criminal prosecution. Accordingly, we find no error in the admission of the transcript.

V.

Damron's last assignment of error is that counts seven and nine of the indictment subjected him to conviction of two felonies for the commission of a single act. Both of these counts charge a violation of W.Va.Code § 32–1–101.[10] Count seven of the indictment follows the language of W.Va.Code § 32–1–101(3) and charges that the appellant sold stock subscriptions "by means of acts, practices, transactions and a course of conduct which operated ... as a fraud and deceit upon the purchasers ...." The alleged fraudulent practices are that Damron represented to the Swadleys that their investments would pay dividends twice a month in an amount sufficient to repay their investment within one year, when Damron had no reasonable anticipation that the corporation would be able to pay such dividends, and that Damron failed to disclose the involvement of Fairchild.[11]

---

**10.** W.Va.Code § 32–1–101 provides:

It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly

(1) To employ any device, scheme or artifice to defraud;

(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which they are made, not misleading; or

(3) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

**11.** Count seven reads in its entirety:

That Roger A. Damron from on or about the 11th day of April, 1979, to on or about the _____ day of June, 1979, in the said County of Ritchie, willfully, unlawfully and feloniously offered for sale and sold a subscription to and an order for a certain security to-wit: Shares of the Common Capital Stock of a corporation called "Home Movies, Inc.", to Clyde W. Swadley and Claude W. Swadley for value, said subscription being a security as defined by the West Virginia Uniform Securities Act of 1974, as amended, by means of acts, practices, transactions and a course of business which operated and would operate as a fraud and deceit upon the purchasers of said subscriptions as follows:

(a) By knowingly and willfully representing to said purchasers that the said shares of Home Movies, Inc., would pay dividends twice a month in an amount sufficient for the purchasers to recover their entire investment in 1 year or less when in fact, said Roger A. Damron had no reasonable anticipation that Home Movies, Inc., would be able to pay such dividends since at or subsequent to the time of the offers for sale and sales of said sub-

Count nine of the indictment follows the language of W.Va.Code § 32–1–101(1) and charges that Damron sold stock subscriptions "by means of a device, scheme and artifice to defraud the purchasers ...." The alleged fraudulent conduct is that Damron represented to the Swadleys that their investment would be placed in an escrow account, and would be refunded if insufficient subscriptions were obtained to conduct the business of Home Movies, Inc., without disclosing that portions of their investment would be diverted to pay a "consultant's fee" to Fairchild, and that additional portions would be used by Damron for his personal use and benefit.[12] Damron argues that his conviction on both counts subjects him to multiple punishments for the same offense in violation of the constitutional prohibition against double jeopardy. U.S. Const. amend. V; W.Va.Const. art. III, § 5.

The foundation of the appellant's argument rests on his contention that counts seven and nine of the indictment essentially deal with the same set of circumstances surrounding the sale of stock to Clyde and Claude Swadley. He emphasizes that the counts do not distinguish between acts committed towards each victim separately, as is done in other counts of the indictment, but instead simply add a felony charge by alleging that the same statutory offense was committed in a different way. The State concedes that counts seven and nine allege violations of the same statute, and that because both victims are named in

scriptions the said Roger A. Damron utilized the proceeds from the sale of subscriptions to:

(1) pay substantial consultant fees to Paul R. Fairchild;

(2) pay advance fees to the said Roger A. Damron for his right to the exclusive distributorship in Kentucky of the services of Lurray Company, Incorporated, which right Roger A. Damron personally acquired subsequent to April 11, 1979, with proceeds from the sale of said subscriptions in Home Movies, Inc.,

(3) pay promotional and operating expense of Roger A. Damron in selling subscriptions of shares in Home Movies, Inc., thereby exhausting any funds available to Home Movies, Inc. for business operations from the proceeds of said subscriptions sales, ultimately causing the investments of said purchasers to be of materially less value than represented to be and;

(b) The said accused, Roger A. Damron, induced the aforesaid purchasers to invest in the aforesaid subscriptions by failing to disclose that Paul R. Fairchild acted as an advisor in the solicitation of said purchasers and accompanied and directed said accused, Roger A. Damron, to the residence of said purchasers on the occasions of the solicitations and sales, and received a fee for the said actions from Roger A. Damron out of the proceeds of the payments for said subscriptions against the peace and dignity of the State;

**12.** Count nine reads in its entirety:

That Roger A. Damron from on or about the 11th day of April, 1979, to on or about the _____ day of June, 1979, in the said County of Ritchie, willfully, unlawfully and feloniously offered for sale and sold subscriptions to and orders for a certain security to-wit: shares of the Common Capital Stock of a corporation called "Home Movies, Inc." to Clyde W. Swadley and Claude W. Swadley for value, said subscriptions being a security as defined by the West Virginia Uniform Securities Act of 1974, as amended, by means of a device, scheme and artifice to defraud the aforesaid purchasers as follows: The said accused fraudulently induced the aforesaid purchasers to invest in the aforesaid subscriptions by willfully representing that their money would be placed in an escrow account and that if insufficient subscriptions were secured to conduct the business of Home Movies, Inc., one-half ($\frac{1}{2}$) of the amount of the purchase price of the subscription for shares in Home Movies, Inc., would be returned to them, without disclosing the following material facts concerning the ability of the said accused to make such refunds:

(a) That the investment of the aforesaid purchasers would not be placed in an escrow account but would be placed in a checking account with a portion of said account to be utilized in the following manner:

(1) That one-thousand, five-hundred dollars ($1,500.00) of the respective five-thousand dollars ($5,000.00) investment of each of the aforesaid purchasers, for a total of three thousand dollars ($3,000.00) of the ten-thousand dollars ($10,000.00) invested by the two (2) aforesaid purchasers, would be used to pay a consultant's fee to Paul R. Fairchild; and

(2) That an additional one-thousand, five-hundred ($1,500.00) dollars of the investments of each of the aforesaid purchasers would be used for the personal use and benefit of the accused Roger A. Damron. The foregoing transactions, acts, practices and course of business operated as a fraud and deceit upon the aforesaid purchasers ultimately causing the aforesaid purchasers to lose the pecuniary value of their investment, against the peace and dignity of the State;

both counts, it cannot be asserted on appeal that counts seven and nine can be punished separately simply because there are two victims. Nevertheless, the State maintains that the different misrepresentations and fraudulent activities alleged in each count constitute separate offenses for which the appellant may be separately punished.

In determining whether related but separately defined statutory offenses constitute the "same offense" under the double jeopardy clause we have in the past examined the legislative intent in enacting the statutes. For example, in *State v. Reed*, 166 W.Va. 558, 276 S.E.2d 313 (1981), where we held that under our criminal sexual conduct statutes, W.Va.Code § 61–8B–1 *et seq.* [1976], a single sexual act cannot result in multiple criminal convictions, we stated:

> Since many statutory crimes are duplicative, it is well established that separate statutory crimes may be the "same offense" under the double jeopardy clause, even though they are not identical in either constituent elements or actual proof. *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977). Each case ultimately turns upon whether the Legislature intended an act to be punished by only one or by more than one statutory provision. *Gore v. United States*, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1045 (1958). 166 W.Va. at 567, 276 S.E.2d at 319–320.

Likewise, in *State v. Carter*, 168 W.Va. 90, 282 S.E.2d 277 (1981), where we held that an act of forcible oral intercourse and an act of forcible anal intercourse occurring during a continuous sexual assault are separate and distinct offenses, we looked first to the language of the statute to determine if separate offenses, and thus multiple punishments, were intended.

More recently, in *State v. Riley*, 169 W.Va. 354, 287 S.E.2d 502 (1982), and *State v. Myers*, 171 W.Va. 277, 298 S.E.2d 813 (1982), we have indicated that where the double jeopardy issue involves instances where there has been an ongoing criminal scheme such as embezzlement, and the question is whether the activity constitutes one or several crimes, we will focus on the evidence to determine whether there have been separate crimes meriting separate punishments. Under this approach it must be recognized that "jeopardy principles are resolved 'not in a mechanical solution relating to proximity in time but rather an analysis of the conduct and intent of the defendant.'" *State v. Carter, supra,* at 280, *quoting State ex rel. Watson v. Ferguson*, 166 W.Va. 337, 274 S.E.2d 440, 448 (1980).

■ Both of these inquiries are warranted in this case since we are here faced with alleged violations of similar subsections of the same statute and with an ongoing criminal scheme to defraud. Thus to determine whether violations of W.Va.Code §§ 32–1–101(1) and (3) committed during an ongoing criminal scheme to defraud constitute the "same offense" under the double jeopardy clause, we look first to the language of the statute to determine if separate offenses, and thus multiple punishments, were intended, and next to the evidence to determine whether there have been separate crimes meriting separate punishments.

■ An examination of the legislative history of W.Va.Code § 32–1–101 indicates that three separately punishable offenses in the context of a single transaction were not intended by the inclusion of the three definitions of prohibited conduct in the three subsections of the statute. Section 101 of the Uniform Securities Act is substantially Rule 10b–5 promulgated by the federal Securities and Exchange Commission.[13] *See* L. Loss, *Commentary on the*

---

13. S.E.C. Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility or any national securities exchange,

(1) to employ any device, scheme or artifice to defraud,

(2) to make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice or course of business which operates or would operate as a fraud or deciet upon any person, in

*Uniform Securities Act* at 6 (1976). It has been said of subsections (1) and (3) of Rule 10b–5, the provisions relevant to this proceeding, that "[t]he words are different, but it is hard to see what the distinctions are." 1 A. Bromberg and L. Lowenfels, *Securities Fraud & Commodities Fraud* § 2.6(1) at 49 (1967). Indeed, the S.E.C. itself regards the three subsections as "mutually supporting rather than mutually exclusive," so that "a breach of duty of disclosure may be viewed as a device or scheme, an implied misrepresentation, and an act or practice violative of all three [subsections]." *Cady, Roberts & Co.,* 40 S.E.C. 907, 913 (1961). *See Speed v. Transamerica Corp.,* 99 F.Supp. 808, 829 (D.Del. 1951). Thus, it makes no difference which subsection is used in a given case. *List v. Fashion Park, Inc.,* 340 F.2d 457 (2d Cir.) *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). Consequently, while it is true that the same transaction may violate two distinct provisions of the same statute or different statutes and be punishable under both as separate substantive crimes, *Gore v. United States,* 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958), that rule does not apply here, where we do not have two *distinct* provisions of the same statute, but rather two methods of describing the same statutory offense.

Moreover, the crimes alleged in counts seven and nine of the indictment do not involve separate sales of stock to each of the Swadley brothers, rather the indictment consolidates both sales into a single transaction. Had separate sales been alleged in each count, the appellant's double jeopardy argument would be substantially weakened. We are influenced in reaching this conclusion by the generally accepted rule in the federal courts that even though there may be a common thread of fraud among different sales of securities, each sale may constitute a separate offense. *See United States v. Naftalin,* 606 F.2d 809 (8th Cir.1979); *Sanders v. United States,* 415 F.2d 621 (5th Cir.), *cert. denied,* 397 U.S. 976, 90 S.Ct. 1096, 25 L.Ed.2d 271 (1969); *United States v. Anzelmo,* 319

F.Supp. 1106 (E.D.La.1970); *United States v. Binstock,* 37 F.R.D. 13 (S.D.N.Y.1965). However, this rule is not applicable where the prosecution has consolidated *seriatum* sales into a single transaction in each count of the indictment.

Further, the fact that different fraudulent representations are alleged in each count does not transform them into separate crimes in light of the evidence which indicates that both statements were made by Damron at the same meeting with the Swadleys and were intended to effect the same transaction. Surely, the Legislature did not intend by enactment of W.Va.Code § 32–1–101 to punish separately every word uttered by a defendant during the course of a fraudulent sales pitch. Such a holding could result in absurd sentences out of all proportion with the seriousness of the offense. Accordingly, we find that counts seven and nine of the indictment are duplicitous and subject the appellant to multiple punishments for the same offense in violation of double jeopardy principles. The appellant's convictions on these two counts of the indictment represent a single offense for which only one punishment may be imposed. We are therefore remanding this case to the Circuit Court of Ritchie County for the entry of an order consolidating the appellant's convictions under counts seven and nine of the indictment, and for resentencing of the appellant.

For the foregoing reasons the judgment of the Circuit Court of Ritchie County in Case No. 15501 is affirmed. Case No. 15580 is remanded for proceedings consistent with this opinion.

No. 15501—Affirmed;

No. 15580—Remanded.

connection with the purchase or sale of any

security. 17 C.F.R. § 240.10b–5 (1981).