# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs)  No. 13-1211** (Marion County 12 F-202 and 13-F-41)

**Matthew Monroe Cottingham,**
**Defendant Below, Petitioner**

**FILED**

November 3, 2014
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Matthew Monroe Cottingham, by counsel Scott A. Shough, appeals the order of the Circuit Court of Marion County, entered November 19, 2013, that denied his post-trial motion for a judgment of acquittal for his convictions on eleven counts of sexual assault in the second degree and eleven counts of sexual abuse by a parent, guardian, or custodian. Petitioner's victims were his girlfriend's two young daughters, A.H. and L.H. Respondent, the State of West Virginia, filed a response by its counsel, Laura Young.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In 2012, thirteen-year-old A.H. lived in Fairmont with her mother, petitioner (who was her mother's boyfriend), and her three step-siblings, including L.H, her nine-year-old sister. On July 20, 2012, A.H. told her mother that petitioner had raped her the night before while her mother was out of the house. A.H. was taken to the emergency room and examined by a Sexual Assault Nurse Examiner ("SANE nurse"). A.H. was found to have a centimeter-long abrasion on her vagina. The age of the abrasion could not be ascertained, but no healing was noted. The SANE nurse could not visualize or test the interior of A.H.'s vagina or cervix because A.H. "screamed in pain" when this examination was attempted.

Later that day, while a police officer was investigating the crime scene, A.H. told the officer that she found the underwear petitioner had been wearing the night before at the bottom of a kitchen trash can. A.H. told the officer that she had pulled the underwear out of the trash can, but—at her mother's instruction—had placed it back in the trash can. Thereafter, the officer retrieved the underwear which was torn at the waist band. The underwear was later found to contain petitioner's and A.H.'s DNA, as well as petitioner's seminal fluid and sperm. The pajama bottoms petitioner had been wearing at the time of A.H.'s assault were found laundered in the home's washing machine.

1

On July 27, 2012, A.H. participated in a forensic interview conducted by Child Protective Services worker Stacey Miller (the "CPS worker"). A.H. told the CPS worker that, on the night of the assault, her mother had left their apartment because A.H. and her mother had argued. A.H. then said that, after her mother left the house, she had gone into her mother and petitioner's bedroom to say goodnight to petitioner, whom she considered to be her stepfather. While there, a discussion ensued regarding A.H.'s feelings about the fact that she had gained weight. Petitioner asked A.H. to remove her shirt and bra. A.H attempted to leave the room, but petitioner grabbed her by the wrists and/or about the waist. Petitioner then kicked off his pajama pants, pushed aside his underwear, and pulled A.H. down on top of him where he penetrated her.

A.H.'s then nine-year-old sister, L.H.,[1] also participated in a forensic interview on July 27, 2012. During the interview, L.H. repeatedly denied any molestation and stated that she had experienced only "good" or "non-dating" touches from petitioner. However, soon thereafter, L.H. told her step-mother (her biological father's wife) that petitioner had sexually assaulted her when she was in pre-school, kindergarten, and first grade. On August 4, 2012, L.H. was examined by a SANE nurse who found no signs of trauma. However, the SANE nurse later testified that she did not expect to find any signs of acute injury in L.H. because L.H.'s abuse was remote in time.

On August 9, 2012, L.H was interviewed by the CPS worker. During the interview, L.H. stated that, when she was younger, petitioner would awaken her for school early in the morning and sexually assault her. L.H. stated this happened "often." L.H. also said that she told her step-mother about the abuse because petitioner was in jail and her step-mother was "stronger" than her biological mother. L.H. also revealed that petitioner had threatened to "kill" or "cut" her mother if she told anyone about petitioner's acts.

On October 10, 2012, petitioner was indicted in case number 12-F-202 on one count of sexual assault in the second degree against A.H. in violation of West Virginia Code § 61-8B-4(A)(1), and one count of sexual abuse by a parent, guardian or custodian against A.H. in violation of West Virginia Code § 61-8D-5. On February 5, 2013, petitioner was indicted in case number 13-F-41 on ten counts of sexual assault in the first degree against L.H. in violation of West Virginia Code § 61-8B-3(a)(2) and ten counts of sexual abuse by a parent, guardian, or custodian against L.H. in violation of West Virginia Code § 61-8D-5.

The two cases were joined for a bench trial held on August 7-8, 2013. Those who investigated the crimes and both child victims testified on behalf of the State. During the defense's case-in-chief, both petitioner and the children's mother testified that, just before A.H. disclosed the rape, the couple was discussing a move to Virginia so petitioner could join the Navy. Both also testified that A.H. indicated that she did not want to move. Petitioner testified that he threw his underwear in the trash because it was old and torn. He also said it was not unusual for him to do his own laundry. The children's mother corroborated the fact that petitioner occasionally did his own laundry and that he had old and worn underwear that needed to be thrown away. At the close of evidence, the parties agreed that they were not asking the trial

---

[1] L.H. and A.H. have the same mother, but different fathers, neither of whom was petitioner.

court to make specific findings of fact. The trial court then concluded that the State had met its burden of proof beyond a reasonable doubt and found petitioner guilty on all counts of both indictments.

On August 12, 2013, petitioner filed a post-trial motion for a judgment of acquittal. Following a hearing on the matter, the trial court, by order entered November 19, 2013, denied petitioner's motion on the ground that "each of the verdicts was supported by the substantial weight of the evidence." On December 11, 2013, the trial court entered petitioner's sentencing order. Petitioner's net effective sentence exceeded two hundred years in prison.

Petitioner now appeals the order denying his post-trial motion for a judgment of acquittal. We review the denial of a motion for a judgment of acquittal or, in the alternative, for a new trial as follows:

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. Pt. 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000).

On appeal, petitioner raises three assignments of error. Petitioner first argues that the trial court erred in finding that A.H.'s and L.H.'s testimony at trial was inherently credible. With regard to A.H., petitioner highlights that, at trial, A.H. admitted that she lied when she (1) once told her mother that petitioner had sexually abused her; (2) told the SANE nurse that petitioner had a small penis;[2] (3) told the SANE nurse that the first time she cut herself was following the alleged rape; and (4) told her counselor that she did not use drugs, smoke cigarettes, or huff cleaning chemicals. Petitioner also points to the fact that A.H. told the SANE nurse that the assault stopped when her baby half-sister, who was sleeping in a toddler bed in petitioner's room, stirred. Yet, she testified at trial that the assault stopped when the baby cried out.

With regard to L.H., petitioner highlights that, in 2008, before the events resulting in this prosecution, L.H. had accused him of inappropriate touching. However, Child Protective Services investigated and found the allegation to be unsubstantiated. Further, when L.H. was initially interviewed following A.H.'s rape allegation, L.H. repeatedly denied that petitioner had touched her inappropriately. Petitioner also highlights that L.H. testified that she believes vampires and ghosts are "sometimes real" and werewolves are "real." Finally, petitioner claims that L.H. has learning difficulties and is "lower functioning."

---

[2] A.H. thereafter admitted (1) that she knew nothing about the size of petitioner's penis given that she had not seen it during the assault; and (2) that she made the claim because she heard her mother say it during an argument with petitioner.

3

Petitioner also avers that the physical evidence in this case did not support either girl's claims given that A.H. had no bruising on her body; her vagina was not bruised, swollen, or torn; and neither his seminal fluid nor his sperm were found on A.H.'s body even though she had not yet showered when she was examined by the SANE nurse. As for petitioner's underwear, which contained both A.H.'s and petitioner's DNA, petitioner claims that A.H. routinely spit in the kitchen trash can where the underwear was found and, therefore, her DNA was placed on the underwear when A.H. pulled it out of the trash can.

Petitioner's arguments are best summarized as a challenge to the sufficiency of the testimonial and physical evidence presented by the State during his bench trial. We review such challenges pursuant to the standard established in Syllabus Point 1 of *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995):

> The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

*Id.* at 663, 461 S.E.2d at 169.

The State admitted the following evidence at trial. First, A.H. told her mother, a SANE nurse, a CPS forensic interviewer, and a therapist that petitioner raped her. Similarly, L.H. told her step-mother, a SANE nurse, a CPS forensic interviewer, and a therapist that petitioner had repeatedly assaulted her over a period of three years. Second, both girls testified in detail about the assaults. Third, with regard to physical evidence, the State entered evidence showing that, following petitioner's rape, A.H. was in pain and had an abrasion on her vagina. As for L.H., the SANE nurse testified at trial that she typically did not find evidence of injury where the examination is remote in time to an assault. Fourth, petitioner threw away his underwear and washed his pajama bottoms immediately after wearing them, which was something he usually did not do. Fifth, petitioner's underwear was torn and contained a mixture of his and A.H.'s DNA and petitioner's seminal fluid. Viewing this evidence in the light most favorable to the prosecution, a rational trier of fact could have found that the State proved the essential elements of the crime beyond a reasonable doubt.

As for petitioner's other claims, we first note that the law does not require that a sexual assault victim's claims be corroborated or that a victim have a demonstrable physical injury for a defendant to be found guilty. As for A.H.'s admission that she had lied in the past, such lies did not prove that she was lying when she testified at petitioner's trial. Further, the trial court was made aware of those lies and was able to weigh A.H.'s credibility with that knowledge in mind. As for L.H.'s youth, mental functions, and child-like beliefs, the trial court heard about each and was, likewise, able to weigh L.H.'s credibility. Further, both children testified and were vigorously cross-examined by petitioner's defense counsel. Thereafter, the trial court—which in this case was the trier of fact—found the victims to be credible. We have said, "An appellate

court may not decide the credibility of witnesses or weigh evidence as that is the exclusive function and task of the trier of fact." *Guthrie*, 194 W.Va. at 669 n.9, 461 S.E.2d at 175 n.9. Therefore, we find no error in regard to this assignment of error.

Petitioner's second assignment of error is that the trial court abused its discretion in allowing the State to ask A.H. leading and improper questions at petitioner's trial. Petitioner also challenges the State's repeated use of the word, "okay," following many of the answers given by A.H. during her testimony. Petitioner claims that these comments encouraged A.H. to continue to answer in a manner that was pleasing to the State.

Rule 611(c) of the West Virginia Rules of Evidence provides that, although leading questions "should not be used on the direct examination of a witness," an exception "may be necessary to develop the witness' testimony." Further, "[t]he allowance of leading questions rests largely in the discretion of the trial court, and absent an abuse of such discretion, the trial court's ruling will not be disturbed." Syl. Pt. 6, *State v. Fairchild*, 171 W.Va. 137, 298 S.E.2d 110 (1982). Here, the record on appeal shows that A.H. was very reticent to testify, she had to be repeatedly asked to speak up, and she often would not give an answer unless prompted to do so. Given these problems and the fact that the trial court served as the fact-finder in this case, we find that the trial court did not abuse its discretion in allowing the State to ask this child-witness leading questions on direct examination as a means of developing her testimony.

With regard to the State saying, "Okay," in response to A.H.'s answers, the trial court noted that the State was merely affirming that A.H. had, in fact, answered the question. Importantly, the trial court added that "with respect to [the prosecutor's] affirmations, they've had no impact on me as a finder of fact." Hence, in this bench trial, it is clear that petitioner was not prejudiced by State's use of the word "okay" during A.H.'s testimony.

Petitioner's third and final assignment of error is that the trial court erred in failing to set forth any *substantial* findings as to why it denied petitioner's post-trial motion for a judgment of acquittal. We note, however, (1) that petitioner did not request substantial findings of fact in his motion for a judgment of acquittal, (2) that petitioner's counsel did not request such findings when he argued the motion before the trial court, and (3) that, in his appeal brief, petitioner fails to cite to any authority that requires a trial court to set forth *substantial* findings as to why it denied a motion for a judgment of acquittal. Importantly, the order on appeal provides that the circuit court denied the motion on the ground that "each of the verdicts was supported by the substantial weight of the evidence" at petitioner's trial. On these facts, we cannot say that the trial court erred in the manner in which it rendered its decision on petitioner's motion for a judgment of acquittal.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** November 3, 2014

**CONCURRED IN BY:**

Chief Justice Robin Jean Davis
Justice Brent D. Benjamin
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Allen H. Loughry II

6