# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.)  No. 17-0467** (Fayette County 16-F-119)

**Charles T.,**
**Defendant Below, Petitioner**

**FILED**

**November 5, 2018**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Charles T.,[1] by counsel Timothy P. Lupardus, appeals a sentencing order entered by the Circuit Court of Fayette County on April 17, 2017, following his jury conviction for thirteen counts of incest, thirteen counts of sexual abuse by a parent, guardian or custodian, and thirteen counts of sexual assault in the second degree.[2] Petitioner failed to preserve any of the trial errors now claimed and, therefore, asks the Court to apply the plain error doctrine. Petitioner also asserts ineffective of assistance counsel. Respondent State of West Virginia, by counsel Scott E. Johnson, filed a response.

Having considered the parties' briefs and oral arguments, the appendix record, and the applicable legal authority, the Court finds no substantial question of law and no prejudicial error and, therefore, we affirm petitioner's convictions and sentences. The Court also disposes of the case through a memorandum decision as contemplated under Rule 21 of the West Virginia Rules of Appellate Procedure.

---

[1]Given the sensitive nature of the facts involved in this proceeding, we refer to the child victim and her siblings by their initials, and petitioner, as well as other relatives of the victim, by their last initials. *See* W. Va. R. App. P. 40(e), *see also State v. Robert Scott R., Jr.*, 233 W. Va. 12, 754 S.E.2d 588 (2014); *State v. Larry A.H.*, 230 W. Va. 709, 742 S.E.2d 125 (2013); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

[2]Petitioner raises no assignments of error regarding the sentence imposed by the circuit court.

## I.  Facts and Procedural History

From June 2014 to June 2015, the victim, C.B., lived with her mother, Shawnta T., her brother, her sister,[3] and her stepfather, petitioner. C.B. testified that she was forced to have sex with petitioner every day during this time period, except when her mother had the day off from work. C.B. also testified that she asked petitioner to stop and told him that it hurt. C.B. testified that the sexual abuse took place "in the barn, inside the vehicles and–just about everywhere[.]" C.B. testified petitioner would use a sock to wipe off his penis after finishing. C.B. never told anyone about the sexual abuse until June 22, 2015, because she was scared and did not want petitioner to hurt her mom or anyone in her family. C.B. testified that petitioner told her not to tell anyone about the sexual abuse, but never threatened her.

On June 22, 2015, petitioner once again engaged in sexual abuse of C.B. in a blackberry patch near the family's home and used a sock to clean up afterwards. Later that same day, around 11:00 p.m., there was a dispute between C.B. and petitioner over C.B.'s cellphone. Shawnta was also present. Petitioner testified that he saw what he described as inappropriate text messages on C.B's cellphone. Shawnta said that the text messages were from boys and the messages made petitioner mad. Petitioner took C.B.'s cellphone and an argument ensued. C.B. then accused petitioner of sexual abuse, because she "was tired of being yelled at." She "was scared." C.B. testified that petitioner yelled at her and called her "'a lying little bitch.'"

Shawnta testified that petitioner denied C.B.'s allegations and told her to contact Child Protective Services ("CPS"). She took petitioner to his mother's home, but did not call CPS until the next morning. Shawnta further testified that she did not know what to think about her daughter's allegations until she watched C.B.'s interview at the Child Advocacy Center and heard her daughter talk about petitioner's use of a sock after sex. Shawnta testified, "That was something I don't remember him ever not doing." She also testified that on the day that her daughter disclosed the sexual abuse that had occurred, her husband did go out for a walk after the disclosure, but before she took him to his mother's home. She did not know where petitioner went on his walk.

Officer James Pack with the Fayette County Sheriff's Department testified that he was notified of the complaint of sexual abuse by CPS. He investigated the complaint by contacting petitioner, who came in to discuss the allegations voluntarily, and the other family members at the home, including the victim. He did not look for a sock or search the residence as part of his investigation, because the victim indicated that she had searched for

---

[3]The victim's sister did not testify at trial.

2

the sock and had been unable to locate it. A DNA sample was taken from petitioner under a search warrant, but no DNA was matched in connection with the crime.

C.B. was examined by Dr. Joan Phillips with the Child Advocacy Center at Women and Children's Hospital seven days after the alleged sexual abuse. Dr. Phillips testified that her examination of the victim revealed that C.B. had abnormal findings on her labia–two of which looked like "scooped-out ulcers" and one looked like an abrasion. She also testified that sexual activity causes this type of trauma and stated that "the fact that I saw something physical that correlated with the time, the previous week, was significant."[4] Dr. Phillips did not do any DNA testing as her examination of the victim occurred seven days after the incident.

Petitioner's defense was that his stepdaughter made the allegations up because she was angry about being disciplined over the text messages found on her cellphone. Petitioner testified and called two other witnesses, Terra Hopkins and A.B, the victim's brother, who petitioner used to attack the victim's credibility. Ms. Hopkins previously worked for the Department of Health and Human Resources and had investigated a complaint against Shawnta in March and April of 2015. That complaint ended up with a determination that the allegations were unsubstantiated.[5] Ms. Hopkins testified that during her investigation of the complaint against the victim's mother, she did not recall the victim ever disclosing any type of sexual mistreatment of any kind.

Petitioner also called A.B., who testified on direct examination that he had moved out of his home in 2014 when he was seventeen years old, due to a physical fight with his father that resulted in a domestic charge against the petitioner. According to A.B., on the night of June 22, 2015, petitioner called him to tell him about the allegations made by C.B. A.B. testified that he went home the next day, around 1:00 p.m., to help his sister look for the sock. They did not find one. Because they did not find a sock, A.B. testified that "[i]t made me suspect–or made me change my mind set. I had suspicions that it did happen until I went back there and I found nothing." A.B. testified that he also looked in the house for the sock and did not find it.

_____

[4]Petitioner states in his brief that the State also called, Wyetha Prevost, a Fayette County Child Protective Services worker who testified about allegations against C.B.'s mother. A review of the Appendix Record before the Court does not contain Ms. Prevost's testimony nor is there any page reference to said testimony by petitioner in his brief.

[5]The allegations involved C.B. stating to another person, in part, that "my mother blows me. My mother is a sexual pervert."

Petitioner testified that after telling C.B. that she was grounded because of an inappropriate text message he found on her cellphone, C.B. ran to her bedroom, screaming "'Don't make me tell Mom.'" Petitioner responded, "'Tell Mom what? What are you talking about?'" Petitioner stated that he was in shock after hearing what C.B. was accusing him of doing to her. He stated that he told his wife to take him to his mother's house and that "'[w]e need to call the cops, call CPS, call somebody, so we can figure out what's going on.'"

The jury, during its deliberations, informed the court by a written note that it was "'a hung jury.'" The State and petitioner agreed that the circuit court should give an *Allen* charge,[6] which the circuit court gave to the jury. The jury then returned a verdict finding petitioner guilty on thirteen counts of sexual abuse by a parent, guardian or custodian, thirteen counts of sexual assault in the second degree and thirteen counts of incest. It is from the circuit court's April 17, 2017, Sentencing and Commitment Order that petitioner now appeals.

## II. Discussion

Petitioner argues seven assignments of errors involving the following: 1) whether the circuit court committed plain error by allowing hearsay to be admitted in evidence, leading questions to be asked by the prosecuting attorney, allowing expert testimony without a foundation laid as to expertise, and allowing the State to bolster the victim's testimony through the victim's mother's testimony; 2) whether the circuit court committed plain error by allowing bad character evidence to be improperly admitted at trial; 3) whether the circuit court committed plain error where the jury panel was not "free from exception;"[7] and 4) whether petitioner received ineffective assistance of counsel.

Petitioner's first three assigned errors all involve alleged errors that petitioner did not properly preserve before the circuit court during his trial. Concerning the lack of any objections to the alleged errors now claimed, this Court repeatedly has held that

> "[a]s a general rule, proceedings of trial courts are
> presumed to be regular, unless the contrary affirmatively

---

[6]*See Allen v. United States*, 164 U.S. 492 (1896) (providing for a supplement instruction to be given to encourage deadlocked juries to reach agreement). There is no error raised regarding the *Allen* charge given.

[7]*See* W. Va. Code § 62-3-3 (setting forth process for jury selection in felony cases and providing that jurors be "free from exception").

4

appears upon the record, and errors assigned for the first time in an appellate court will not be regarded in any matter of which the trial court had jurisdiction or which might have been remedied in the trial court if objected to there." Syl. pt. 17, *State v. Thomas*, 157 W. Va. 640, 203 S.E.2d 445 (1974). "We have invoked this principle with a near religious fervor. This variant of the 'raise or waive' rule cannot be dismissed lightly as a mere technicality. The rule is founded upon important considerations of fairness, judicial economy, and practical wisdom." *State v. Miller*, 197 W. Va. 588, 597, 476 S.E.2d 535, 544 (1996). *See* Syl. pt. 4, *State v. Browning*, 199 W. Va. 417, 485 S.E.2d 1 (1997) ("This Court will not consider an error which is not properly preserved in the record nor apparent on the face of the record."); *State v. Grimmer*, 162 W. Va. 588, 595, 251 S.E.2d 780, 785 (1979) ("When there is an opportunity to speak, silence may operate as a waiver of objections to error and irregularities at the trial which, if seasonably made and presented, might have been regarded as prejudicial.").

*State v. Salmons*, 203 W. Va. 561, 569, 509 S.E.2d 842, 850 (1998); *see* Syl. Pt. 11, *State v. Davis*, 205 W. Va. 569, 519 S.E.2d 852 (1999) ("'Failure to make timely and proper objection to remarks of counsel made in the presence of the jury, during the trial of a case, constitutes a waiver of the right to raise the question thereafter either in the trial court or in the appellate court.' Syllabus Point 6, *Yuncke v. Welker*, 128 W. Va. 299, 36 S.E.2d 410 (1945)."). "[O]rdinarily this Court will decline, on a direct appeal, to consider the merits of an assignment of error in a criminal case that was not initially presented to the trial court." *Salmons*, 203 W. Va. at 570, 509 S.E.2d at 851.

But, "[t]he raise or waive rule is not absolute." *State v. LaRock*, 196 W. Va. 294, 316, 470 S.E.2d 613, 635 (1996). As we held in syllabus point seven of *LaRock*:

An unpreserved error is deemed plain and affects substantial rights only if the reviewing court finds the lower court skewed the fundamental fairness or basic integrity of the proceedings in some major respect. In clear terms, the plain error rule should be exercised only to avoid a miscarriage of justice. The discretionary authority of this Court invoked by lesser errors should be exercised sparingly and should be reserved for the correction of those few errors that seriously affect the fairness, integrity, or public reputation of the judicial proceedings.

5

*Id.* at 299, 470 S.E.2d at 618. For instance, "[a]lleged errors of a constitutional magnitude will generally trigger a review by this Court under the plain error doctrine." *Salmons*, 203 W. Va. at 571 n.13, 509 S.E.2d at 852 n.13.

The only way petitioner can prevail on any of the first three assigned errors is for the Court to apply the plain error doctrine. As set forth in syllabus points seven and nine of *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995):

> To trigger application of the "plain error" doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings.
> . . . .
> Assuming that an error is "plain," the inquiry must proceed to its last step and a determination made as to whether it affects the substantial rights of the defendant. To affect substantial rights means the error was prejudicial. It must have affected the outcome of the proceedings in the circuit court, and the defendant rather than the prosecutor bears the burden of persuasion with respect to prejudice.

Applying the foregoing principles, petitioner's first assigned error concerns the State asking witnesses leading questions, "eliciting lots of hearsay by which inculpatory evidence was introduced," offering an alleged "expert" opinion from the investigating officer when he was not qualified as an expert, and bolstering its witnesses. Other than setting forth the elements necessary to trigger the plain error doctrine, petitioner offers little legal support for his arguments that the errors he now claims occurred were indeed errors and that the alleged errors affected his substantial rights and seriously affected the "fairness, integrity or public reputation of the judicial proceedings." *Id.*, Syl. Pt. 7.

To that end, regarding petitioner's contention that the State asked leading questions of witnesses,[8] he argues that the leading questions involved "the prosecutor testifying, providing the words, telling the story, while the witness just agreed."[9] In *State v. Fairchild*,

---

[8]Petitioner ignores the fact that where leading questions were asked of witnesses, open-ended questions were often also asked, which allowed witnesses to offer additional testimony regarding the events that transpired.

[9]Petitioner fails to raise the issue of leading questions as a specific assignment of error. But

(continued...)

171 W. Va. 137, 298 S.E.2d 110 (1982), the Court was presented with the same alleged error of the State asking leading questions of witnesses. Despite the Court's recognition of numerous instances of leading questions asked by the State, we also noted that the majority of those questions were not objected to by the defense counsel. The Court found that

> [d]efense counsel's failure to object to leading questions may have been a valid tactical choice. In any event, he cannot raise the issue for the first time on appeal. *State v. Baker*, 169 W. Va. 357, 287 S.E.2d 497 (1982); *State v. Burton*, 163 W. Va. 40, 254 S.E.2d 129 (1979); *State v. Starkey*, 161 W. Va. 517, 244 S.E.2d 219 (1978); *State v. Thomas*, 157 W. Va. 640, 203 S.E.2d 445 (1974).

*Fairchild*, 171 W. Va. at 151, 298 S.E.2d at 124. We decline to apply the plain error doctrine regarding this issue.

Further, petitioner claims that hearsay was admitted, without objection, "to prove seriously impactful matters asserted." Two examples of this alleged plain error provided by petitioner include Officer Pack being questioned about how the victim's disclosure occurred. Officer Pack answered, without objection, that during an argument between the victim and petitioner, the victim "blurted out" that she was going to tell what petitioner had done to her. Additionally, Shawnta testified that her daughter told her that petitioner had been raping her and had taken her virginity.

The Court has said that

> "[h]earsay is presumptively untrustworthy because the out-of-court declarant cannot be cross-examined immediately as to any inaccuracy or ambiguity in his or her statement." Glen Weissenberger, *Hearsay Puzzles: An Essay on Federal Evidence Rule 803(3)*, 64 Temple L.Rev. 145 (1991). In criminal trials, hearsay evidence directly conflicts with the constitutional guarantees embodied in the Confrontation Clause of the Sixth

---

[9](...continued)
given arguments made by petitioner throughout his brief, we address the issue as if it was assigned as error. *LaRock*, 196 W. Va. at 302, 470 S.E.2d at 621 ("Although we liberally construe briefs in determining issues presented for review, issues which are not raised, and those mentioned only in passing but are not supported with pertinent authority, are not considered on appeal.").

Amendment to the United States Constitution and Section 14 of Article III of the West Virginia Constitution.

*State v. Phillips*, 194 W. Va. 569, 575, 461 S.E.2d 75, 81 (1995), *overruled on other grounds by State v. Sutherland*, 231 W. Va. 410, 745 S.E.2d 448 (2013). But in this case, the declarants of the alleged hearsay statements testified at trial and were subject to cross-examination. We, therefore, are not presented any confrontation clause issues. Moreover, petitioner provides little legal authority to support his argument that this Court should recognize plain error regarding this issue. While petitioner refers to various statements as hearsay, he fails to provide the Court with any legal analysis such as why the statements at issue were being offered for the truth of the matter asserted and do not meet any of the hearsay exceptions.

Instead, the single case relied upon by petitioner to support his position is *State v. Jones*, 178 W. Va. 519, 362 S.E.2d 330 (1987), in which the Court reversed a conviction due to hearsay offered by a state trooper. But the hearsay at issue in *Jones* involved statements the alleged child abuse victim made to a state trooper months after the alleged molestation. The trial court admitted the hearsay under the excited utterance exception to the hearsay rule. *Id.* at 522, 362 S.E.2d at 333. The Court reversed because the statements clearly did not fall within the excited utterance exception and the state trooper had "no evidence to offer independent of his interview with . . . [the victim], his entire testimony was impermissible hearsay . . . . [that] significantly bolstered the testimony of the only eye witness . . . [and] its admission was obviously prejudicial." *Id.* at 523, 362 S.E.2d at 334. Further, the victim, who was seven years old at the time of trial, "refused to testify in any detail about the sexual assault beyond acknowledging that the sexual contact had occurred." *Id.* at 522, 362 S.E.2d at 333. We find the facts of *Jones* distinguishable from the instant case and, therefore, it is not controlling. Unlike the victim in *Jones*, C.B. testified in detail about the sexual abuse by petitioner. Further, in order for this Court to find plain error, the burden is on petitioner to show that the statements were inadmissible hearsay. *See* W. Va. R. Evid. 801, 802, and 803. Petitioner, however, fails to meet that burden. *See Miller*, 194 W. Va. at 7, 459 S.E.2d at 117 Syl. Pt. 7. Even assuming, arguendo, that error existed, petitioner has not shown that this alleged error was prejudicial insofar as he has failed to prove that it has affected his substantial rights by changing the outcome of the proceedings in the circuit court. *Id.,* Pt. 9

Next, petitioner argues that "[t]he single biggest error, perhaps, of the trial, from an evidentiary standpoint," is when the State bolstered the victim's testimony by the questions it asked of the victim's mother. An example of this error provided by petitioner involves the State asking Shawnta, the victim's mother: "[W]hen did it really come home to you that this absolutely happened, without a doubt?" To which the mother responded: "When I watched the CAC interview." Shawnta further testified: "Certain places and things . . . habits, I guess

8

were the first, that he practiced with her was quite familiar to me. Places, those places they frequented. A couple of them just dinged on me."

Petitioner relies upon *State v. England*, 180 W. Va. 342, 376 S.E.2d 548 (1988) and *State v. Critzer*, 167 W. Va. 655, 280 S.E.2d 288 (1981), in support of his argument that plain error occurred. The cases of *England* and *Critzer*, however, stand for the proposition that a prosecutor cannot interject his own personal opinion as to the guilt of the defendant or the veracity of a witness. In the instant case, it was not the prosecutor who interjected his personal opinion as to the credibility of a witness. Rather, at issue is the victim's mother's testimony about when she knew the events in question really happened to her daughter. Consequently, petitioner's authority supporting this argument is inapposite to the facts and, therefore, not controlling. Given the lack of legal support for petitioner's contention regarding improper bolstering, we decline to find plain error. Also, petitioner has not shown that this alleged error was prejudicial insofar as he has failed to prove that it has affected his substantial rights by changing the outcome of the proceedings. *Miller*, 194 W. Va. at 7, 459 S.E.2d at 117, Syl. Pt. 9. [10]

Petitioner's next assigned error is that the circuit court committed plain error by allowing the State to cross-examine him about a fight that he had with his son, A.B., and about an altercation that he had with his wife in which he threw a cooler through a window. Petitioner recognizes that these two events are not "factually linked to the case at trial." Further, he argues that his "conviction should be reversed." Prior bad acts are controlled by

---

[10]We readily dispense with petitioner's argument that it was plain error for Officer Pack to offer expert testimony concerning petitioner's use of a sock preventing any DNA from being transferred to the victim. Petitioner maintains that the officer was never qualified to testify as an expert, that there was no foundation for the testimony and that the officer's opinion was not relevant. But petitioner offers no legal authority to support any part of his argument. We stated in *State, Dep't of Health and Human Res., Child Advocate Office v. Robert Morris N.*, 195 W.Va. 759, 466 S.E.2d 827 (1995), that "'[a] skeletal "argument," really nothing more than an assertion, does not preserve a claim. . . . Judges are not like pigs, hunting for truffles buried in briefs.'" *Id.* at 765, 466 S.E.2d at 833 (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991)). Moreover, "[a]lthough we liberally construe briefs in determining issues presented for review, issues . . . mentioned only in passing but are not supported with pertinent authority, are not considered on appeal." *LaRock*, 196 W.Va. at 302, 470 S.E.2d at 621.

Rule of Evidence 404(b). The bad acts introduced here served none of the enumerated purposes under the rule.[11] We find petitioner's argument unavailing.

First, we held in syllabus point three of *State v. Crabtree*, 198 W. Va. 620, 482 S.E.2d 605 (1996), that

> "'[a]n appellant or plaintiff in error will not be permitted to complain of error in the admission of evidence which he offered or elicited, and this is true even of a defendant in a criminal case." Syl. Pt. 2, *State v. Bowman*, 155 W. Va. 562, 184 S.E.2d 314 (1971).' Syl. Pt. 1, *State v. Compton*, 167 W. Va. 16, 277 S.E.2d 724 (1981).

Upon this Court's review of the record, it was not the State that first propounded the evidence regarding the fight that petitioner had with his son, A.B. Rather, that evidence first came in during petitioner's direct examination of A.B., wherein petitioner questioned the witness about a dispute he had with petitioner in which A.B. had a domestic charge against petitioner. Petitioner also testified about the physical altercation with A.B. during his direct examination. Under *Crabtree*, petitioner cannot now complain of the admission of that evidence that he offered. Additionally, petitioner used this evidence to his advantage during his closing argument, arguing to the jury that despite a bad relationship with petitioner that had resulted in a physical altercation, A.B. came back to testify on petitioner's behalf because he wanted the truth to come out that he did not think petitioner committed the crimes alleged here.

Also during cross-examination of petitioner, the State asked: "There was a time where you put a cooler through her [Shawnta T.'s] window, wasn't there?" Petitioner responded: "Yeah, possibly. Yeah, I think so. But that was . . . also an accident." Again, there was no objection concerning this question and response. Moreover, petitioner was asked during re-direct examination by his attorney, whether he acknowledged responsibility for throwing something through a window that was "maybe by accident[,]" to which petitioner responded he did. Petitioner then used this evidence to make the point to the jury that he did acknowledge the things he had done, but he would not acknowledge things he did not do. Upon review, we decline to apply plain error regarding this issue as petitioner has not

---

[11]West Virginia Rule of Evidence 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.*

proven that this alleged error was prejudicial insofar as he has failed to prove that it has affected his substantial rights by changing the outcome of the proceedings. *Miller*, 194 W. Va. at 7, 459 S.E.2d at 117, Syl. Pt. 9.

Petitioner's third assigned error involves some prospective jurors not being removed for cause. At issue are various relationships that some of the jurors had with law enforcement or the judiciary, which came out during voir dire.[12] All of the jurors at issue testified that they could be fair and impartial and did not feel that they were in any way biased or prejudiced for or against the State or against petitioner. Petitioner did not move to strike any of the potential jurors for cause. Consequently, because the jurors identified by petitioner did not sua sponte get stricken by the circuit court, and because not all of the identified jurors were struck by peremptory challenges, petitioner asserts that his convictions should be reversed.

This Court stated in *State v. Newcomb*, 223 W. Va. 843, 679 S.E.2d 675 (2009), that

> """[t]he true test to be applied with regard to [the] qualifications of a juror is whether a juror can, without bias or prejudice, return a verdict based on the evidence and the court's instructions and disregard any prior opinions he may have had." Syllabus Point 1, *State v. Harshbarger*, [170 W.Va. 401, 294 S.E.2d 254 (1982) ]' quoting *State v. Charlot*, 157 W.Va. 994, 1000, 206 S.E.2d 908, 912 (1974)." *State v. Finley*, 177 W.Va. 554, 556, 355 S.E.2d 47, 49 (1987). Moreover, in the *Finley* case this Court stated that all that is required by a trial court when it determines that prospective jurors have been exposed to

---

[12]The relationships identified during voir dire were as follows: Juror Davita, whose daughter worked for Crimes Against Children with the West Virginia State Police in South Charleston; Juror Penick, whose husband was a captain at the Mt. Olive Correctional Center; Juror Atha, who had one nephew who was a West Virginia State Trooper and another nephew who was a Fayette County Deputy Sheriff; Juror Bowyer, who had a stepson who was a Fayette County Deputy Sheriff and a brother-in-law who was a Fayette County Magistrate; Juror Legg, who had a cousin who was a Fayette County Magistrate; Juror Sutphin, who had a cousin who was a legal assistant to the prosecutor; Juror Kees, whose granddaughter's father was a police officer in Fayette County; and Juror Jones, who was a child protective services worker, knew Officer Pack and the assistant prosecutor who tried the case. Ultimately, Jurors Davita, Penick, Bowyer and Jones did not sit on the petit jury. Another juror, Juror Ryder, was excused by the circuit court because he told the court he did not think he could serve, because he knew a child who had been a victim of sexual abuse.

11

potentially prejudicial information is that the trial court "shall question or permit the questioning of the prospective jurors individually, out of the presence of the other prospective jurors, to ascertain whether the prospective jurors remain free of bias or prejudice." Syllabus Point 1, in part, *Finley*.

223 W. Va. at 859, 679 S.E.2d at 691. The record in the instant case reveals the jurors at issue either did not serve because they were stricken, or stated on the record that they could render an impartial, unbiased decision based upon the facts and law presented to them during the course of trial. We, therefore, decline to invoke the plain error doctrine because we do not find that the trial court's failure to sua sponte strike the potential jurors was error, let alone plain error. *See State v. Hutchinson*, 215 W. Va. 313, 599 S.E.2d 736 (2004) (refusing in first degree murder case to apply plain error doctrine where trial court failed to sua sponte strike two jurors where one was friend with decedent and other was former deputy sheriff).

Petitioner's final assignment of error is that he received ineffective assistance of counsel during his trial. Relying upon this Court's decisions in *Miller*,[13] petitioner argues in three short paragraphs that this case is "an exceptional matter in which the record is clear as to ineffective assistance merely from the lack of objections to evidentiary errors, which error was plain and obvious and significantly impacted defendant's chances at trial . . . ."

As this Court held in syllabus point ten of *Hutchinson*,

"[i]t is the extremely rare case when this Court will find ineffective assistance of counsel when such a charge is raised as an assignment of error on a direct appeal. The prudent defense counsel first develops the record regarding ineffective assistance of counsel in a habeas corpus proceeding before the lower court, and may then appeal if such relief is denied. This Court may then have a fully developed record on this issue upon which to more thoroughly review an ineffective assistance of counsel claim." Syllabus Point 10 of *State v. Triplett*, 187 W.Va. 760, 421 S.E.2d 511 (1992).

We decline to entertain petitioner's claim of ineffective assistance of counsel on direct appeal as in *Hutchinson*, "this Court cannot intelligently evaluate the appellant's ineffective assistance of counsel claim, as an adequate record has not been developed reflecting trial counsel's possible explanation of their actions and strategy below. *Miller*, 194 W. Va. at 15,

---

[13]*See* 194 W. Va. at 3, 459 S.E.2d at 114.

459 S.E.2d at 128." 215 W. Va. at 323, 599 S.E.2d at 746. If petitioner wishes to proceed with an ineffective assistance of counsel claim, he can do so by seeking post-conviction habeas corpus relief.

For the foregoing reasons, the circuit court's Sentencing and Commitment Order entered April 17, 2017, is hereby affirmed.

Affirmed.

**ISSUED:** November 5, 2018

**CONCURRED IN BY:**

Chief Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Paul T. Farrell sitting by temporary assignment
Justice Tim Armstead
Justice Evan H. Jenkins

Justice Allen H. Loughry II suspended and therefore not participating.

13